333 A.2d 127.

BIAGIO MARIORENZI *vs.* JOSEPH DIPONTE, INC.
BIAGIO MARIORENZI *vs.* JOSEPH DIPONTE.

FEBRUARY 24, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. These two wrongful death actions were consolidated for a jury trial in the Superior Court. At the conclusion of all the testimony the trial justice granted the defendants' motion for a directed verdict. Since the single issue before us is the correctness of the directed verdict, our narrative must be based on a view of the evidence which is most favorable to the plaintiff. *Wilkinson v. Vesey*, 110 R. I. 606, 295 A.2d 676 (1972). The relevant incident occurred in the spring of 1961.

In April 1961, plaintiff, his wife, and two children lived in the Town of Johnston on Golini Drive. Today, Golini

Drive runs in a somewhat westerly direction from Greenville Avenue to Atwood Avenue. However, in 1961 it began at Greenville Avenue and dead-ended at the edge of an 18-acre parcel of land which was owned by Joseph DiPonte, Inc. The parcel was called "Atwood Acres" and was to be the site for a real estate development containing more than 40 homes. The corporate defendant is a family corporation. Joseph DiPonte owns 50 percent of its stock, and his brother Michael owns the remaining half. The brothers and their wives constitute the board of directors. Joseph DiPonte is a corporate officer and also is listed on the company records as an employee. He told the court and jury that he was in personal charge of the construction activities. Hereafter whenever we refer to the corporation or to Joseph, it will be by the family name "DiPonte."

The Mariorenzis lived in the house on Golini Drive that was closest to the DiPonte property. The distance between the Mariorenzi home and the actual construction activity was estimated as being anywhere from 400 to 800 feet. Site preparations for Atwood Acres began in 1959. Actual construction of houses did not begin until late 1960 when the foundations for two houses were poured. Later, in February or March 1961, excavations were made for the sewerage systems that were to service each house. Originally, it was decided to install cesspools. Cesspool pits were dug and they filled with water. At this point, however, DiPonte discovered that a high water table, clay soil, and an accumulation of surface water made cesspool installation impossible. Accordingly, in mid-April, it was decided to switch from cistern-type cesspools to septic tanks and leaching fields. The septic tanks had a 500-gallon capacity. They measured 4 feet in depth and about 8 feet in width. Holes deep enough to hold the tanks were dug so that the actual top of the tank would be some 6

inches below ground level. The leaching fields were then built. DiPonte described the fields' measurements as being 10 by 18 feet with a depth of between 2 and 3 feet. A drainage engineer testified that septic tank holes could be placed either within the confines of the leaching field or entirely apart from the field. It was agreed that the excavation for the leaching field would fill up with water, and when filled the field looked like a "big puddle." There was evidence that DiPonte at one time used an electric pump to remove this excess water. In mid-April the pump's motor burned out and this brought a halt to the pumping operations.

In the spring of 1961, DiPonte began to place the wooden frames on each foundation. In order to do this, he went to Mr. Mariorenzi and received permission to tie into the Mariorenzis' electrical and water systems. The electricity would power the carpenters' saws and the plasterers would use the water to make the plaster.

A few weeks before the end of April, Mr. Mariorenzi talked to DiPonte and asked him if he could take some of the topsoil that had been stripped away from the construction site and use it to repair several bare spots on his lawn. The topsoil had been placed in a pile near the two foundations. DiPonte gave an affirmative answer and told Mr. Mariorenzi to take whatever he needed.

On Sunday, April 30, 1961, at about 1:30 p.m. Mr. Mariorenzi and his 5-year-old son Tommy took a wheelbarrow and went over to Atwood Acres. They put some of the topsoil into the wheelbarrow and returned to their premises. The father had his shovel and Tommy had "his own little shovel." The father testified that DiPonte came by and saw Tommy and him using the wheelbarrow. Tommy helped his father to cover the lawn's bare spots. At 3:30 p.m. Tommy was given permission to go play

with some of the children in the neighborhood. Some 45 minutes later, Mrs. Mariorenzi asked her husband to go look for the 5-year old. During his canvass of the neighbors, he was told that Tommy was playing on the DiPonte property. When the father went to that area, he saw his son's body floating in a puddle of water that covered a leaching field that was to the rear of one of the foundations. Mr. Mariorenzi jumped into the water and carried the body onto dry land. Resuscitation efforts were fruitless. The father testified that the water came up to a spot somewhere between his neck and chest. The father was 5 feet 6 inches tall.

DiPonte was well aware of the water-filled leaching fields. He was also aware that school children would come onto the site to play. No effort whatever was made to barricade or cover the excavations, and no warning was posted telling of the presence of the water-filled trench. He justified this indifference by his assertion that these children were on "private property."

The trial justice in granting defendants' motion for a directed verdict classified Tommy as a trespasser when he returned to Atwood Acres after helping his father top-dress the lawn. He then referred to the rule in this state which holds that ordinarily a landowner owes no duty to a trespasser other than to refrain from willfully or wantonly injuring him. He found no such evidence in the record which he felt would make DiPonte liable for the consequence of the April 30 tragedy.

The plaintiff in his appeal has launched a broadside attack on the trial justice's ruling. He argues that Tommy's status on the late afternoon of April 30 was that of either an invitee or a licensee. Failing in these contentions he argues that even assuming Tommy's status was that of a trespasser, there was sufficient evidence from which the jury could find a behavior on DiPonte's part

that would qualify as being "willful or wanton." Finally, plaintiff contends that if all his points are meritless, the time has come when we should decide that the distinctions recognized at common law between a trespasser, an invitee, and a licensee have no place in the society in which we live.

This jurisdiction has in the past recognized a difference in the duty owed an invitee, licensee or social guest, and a trespasser. *Dodge* v. *Parish of the Church of the Transfiguration,* 106 R. I. 342, 259 A.2d 843 (1969). The invitee is an individual who comes on one's land at the invitation of the landowner, either expressed or implied for the transaction of business or any other purpose beneficial to the owner. To such an individual, the owner owes a duty to keep his premises in a reasonably safe condition. *DeMello* v. *St. Thomas the Apostle Church Corp.,* 91 R. I. 476, 165 A.2d 500 (1960). A landowner has a duty towards the licensee to refrain from active negligence or from knowingly letting him come upon a hidden peril or from willfully causing him harm. *Perry* v. *St. Jean,* 100 R. I. 622, 218 A.2d 484 (1966); *Pagliaro* v. *Pezza,* 92 R. I. 110, 167 A.2d 139 (1961). To a trespasser, the landowner's sole duty is to refrain from harming the trespasser in a willful or wanton manner, and the duty arises only after the trespasser has been discovered in a position of peril. *Previte* v. *Wanskuck Co.,* 80 R. I. 1, 90 A.2d 769 (1952); *Erenkrantz* v. *Palmer,* 69 R. I. 478, 35 A.2d 224 (1944).

We agree with the trial justice's determination as to Tommy's status. He certainly was neither an invitee nor a licensee when he returned to the construction site after helping his father repair the lawn. The father agreed that the invitation extended by DiPonte relating to the taking of loam was directed to him and not to Tommy. Even if we assume there was an implied invitation to Tommy, the invitation was limited to the times he accompanied

his father. There was never an implied invitation to go onto the premises by himself.

If we look upon the father as a licensee, he had a limited license. He could go onto the DiPonte property only for the purpose of obtaining loam. Arguendo, if the license extended to the 5-year-old, it had terminated at the time he had completed his lawn repair chores and went off to play with his friends.

Finally, there is no evidence whatever that DiPonte was aware of Tommy's late afternoon return to the construction site. So even if we were to classify the maintenance of the unguarded, unprotected leach field in the "willful or wanton" category, we would have to affirm the directed verdict because DiPonte's ignorance of Tommy's return nullified any duty of care that might have been due the 5-year-old trespasser.[1]

Having found that Tommy's trespassing precluded any consideration by the jury of DiPonte's total failure to do anything about its puddled leach field, we now come to the question of whether we should continue to measure a landowner's duty of care to one who enters upon his property by classifying the entrant as a trespasser, a licensee, or an invitee. The common-law categories have been in effect since the mid-19th century. The distinctions were first adopted in the United States during the days of the Civil War. *Sweeny* v. *Old Colony & Newport R.R.*, 92 Mass. 368 (1865); *see* Hughes, *Duties To Trespassers: A Comparative Survey And Revaluation*, 68 Yale L.J. 633 (1959); Marsh, *The History and Comparative*

---

[1]For those who may wonder at our failure to refer to the so-called attractive nuisance or trespassing child doctrine, we would point out that while we have recognized such a doctrine, our 1971 adoption was given a strictly prospective application. *Haddad* v. *First Nat'l Stores, Inc.*, 109 R. I. 59, 280 A.2d 93 (1971). Tommy's mishap occurred some 10 years before *Haddad*.

*Law of Invitees, Licensees and Trespassers,* 69 L.Q. Rev. 182 (1953). However, there has been a change since the days of Lincoln.

In 1957, Great Britain's Parliament enacted a statute abolishing the distinction between licensees and invitees. Occupier's Liability Act, 5 & 6 Eliz. 2, c. 31 (1957). Later, the United States Supreme Court indicated its dissatisfaction when in refusing to apply the licensee-invitee distinction to an admiralty proceeding it said:

> "The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land * * * which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.'" *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U. S. 625, 630-31, 79 S.Ct. 406, 410, 3 L.Ed.2d 550, 554-55 (1959).

The court in *Gould* v. *DeBeve,* 330 F.2d 826 (D.C. Cir. 1964), pointed out one of the faults of the common-law classification system when it questioned the justification for affording the same degree of care to two trespassers —one an 18th century "poacher" upon a manorial estate during the days of the landed gentry in England and the other a 2-year-old infant visiting the apartment of his

mother's friend. "The manifest differences between them suggest strongly that projecting the label from one to the other can not rationally be an automatic determinant of the result in each case in which injuries attributable to the landlord have been sustained." *Id.* at 829. Although the court recognized this anomaly, it abided by the traditional classification system but determined that the 2-year-old's fall out of a third floor window was attributable to the landlord's willful and wanton failure to repair the window's screen.

In 1968, the California Supreme Court rejected the traditional classification and in its place substituted the test whereby liability is measured by whether or not the landowner has in the particular circumstances exercised reasonable care. In taking this stand, the court observed that "[a] man's life or limb does not become less worthy of protection by the law * * * because he has come upon the land of another without permission * * *" and observed that the entrant's status, instead of having its past conclusive potential on the issue of liability, would be just one factor in assessing the landowner's conduct. *Rowland* v. *Christian*, 69 Cal.2d 108, 118, 443 P.2d 561, 568, 70 Cal. Rptr. 97, 104 (1968). The common-law rule, with all its niceties and fine distinctions such as "child trespassers," "frequent use of a limited area exception,"[2]

[2]This subcategory is sometimes known as the "beaten path exception." The defendant in such instances is liable to a trespasser injured while using a limited area containing an unreasonable risk of harm. In 2 Restatement (Second) *Torts* §334 at 185 (1965) the identical concept is expressed thusly:

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety." The present Chief Justice in a dissenting opinion in *Zoubra* v. *New York, N.H. & H. R.R.*, 89 R. I. 41, 48, 150 A.2d 643, 646 (1959), took the position that Zoubra

"technical trespassers," "social guests," "implied licensee," and "business visitor," was replaced by a simple uniform test that has worked well in other areas of negligence law. That test is reasonable care under the circumstances where liability can be measured in terms of foreseeability.

A year later, Hawaii joined company with California. Its Supreme Court ruled that "* * * the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others." *Pickard* v. *City & County of Honolulu*, 51 Hawaii 134, 135, 452 P.2d 445, 446 (1969). Colorado followed in the path paved by *Rowland* when its highest court observed that the common-law trichotomy (1) created "confusion and judicial waste," and (2) preserved a harshness which is inappropriate to a modern legal system because it prohibits "the jury from applying changing community standards to a landowner's duties." *Mile High Fence Co.* v. *Radovich*, 175 Colo. 537, 542, 489 P.2d 308, 311-12 (1971).

The latest of *Rowland's* progeny is *Smith* v. *Arbaugh's Restaurant, Inc.*, 469 F.2d 97 (D.C. Cir. 1972). There, the plaintiff, a health inspector, sought damages for injuries he sustained while engaged in the performance of his duties at the defendant restaurant. The inspector argued that he was a "business invitee." The jury apparently determined that he was a "licensee." Chief Judge Bazelon, in judicially jettisoning the common law wrote:

___

could rely on the exception found in §334 as she sought damages for injuries sustained when she was struck by a train while crossing the tracks. The Chief Justice in language which now has a somewhat prophetic tone observed "* * * I think it achieves nothing simply to call the plaintiff a 'trespasser.' I agree with the reasoning adopted in other jurisdictions that in cases of this kind the definition of the plaintiff's status is unimportant, since his presence on the property was reasonably to be anticipated. [citations omitted] The existence of a duty of care in these cases is compelled by the elementary principles of reasonableness of conduct which is the basis of all negligence law."

304

"Rather than continue to predicate liability on the status of the entrant, we have decided to join the modern trend and to apply ordinary principles of negligence to govern a landowner's conduct: A land-owner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of * * * the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk." *Id.* at 100.

In emphasizing that landowners are not to be insurers or to be burdened unreasonably, this distinguished jurist continued:

"Of course, the circumstances of the visitor's entry have some relation to the * * * landowner['s] liability. Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury." *Id.* at 106.

The *Rowland* decision[3] has provided the impetus which has caused several jurisdictions to reassess the viability of the common-law entrant classes. Our neighbor to the north, Massachusetts, has abolished the distinction between licensee and invitee in all areas. *Mounsey* v. *Ellard*, Mass., 297 N.E.2d 43 (1973). There, the plaintiff was a police officer who fell on the defendant's driveway after serving a summons. The court chose at

---

[3]*Rowland* v. *Christian,* 69 Cal.2d 108, 443 P.2d 561, 70 Cal. Rptr. 97 (1968), and the cases which have adopted its rationale in whole or in part, have generated much comment. Some of the more recent expressions, all favorable, can be found in *Landowner's Liability—Traditional Distinctions Between Trespassers, Licensees and Invitees Abolished as Determinative of the Standard of Care Owed a Visitor,* 25 Ala. L. Rev. 401 (1972); *The Changing Standard of Care Owed Licensees, Invitees and Trespassers,* 18 Howard L.J. 220 (1973); *Abolition of the Distinction Between Licensees and Invitees Entitles All Lawful Visitors to a Standard of Reasonable Care,* 8 Suffolk L. Rev. 795 (1974); *Abrogation of Common-Law Entrant Classes of Trespasser, Licensee, and Invitee,* 25 Vand. L. Rev. 623 (1972); *Invitees, Licensees and Trespassers—A Trend Towards Abolishing Classification of Entrants,* 76 W.Va. L. Rev. 202 (1973-74).

that time not to embrace *Rowland* in its entirety in that it still retained the trespasser category. Mr. Justice Kaplan, in a concurring opinion, took issue with this omission because of his belief that adherence to this category would "* * * perpetuate, although on a smaller scale, the kind of tradition-bound and mistaken analysis that I had supposed the court was aiming to correct." *Id.* at 57. Interestingly enough, the Massachusetts Supreme Judicial Court within the past year was confronted with the case of an 11-year-old who was injured after he climbed through the escape hatch onto the roof of an elevator car. The court noted the everincreasing trend of imposing upon owners or occupiers of premises a single duty of reasonable care to all persons coming thereon. Accordingly, the court ruled that the owner owes a duty of reasonable care to a "trespasser who has become helplessly trapped on the premises to the owner's knowledge." *Pridgen* v. *Boston Housing Authority,* Mass., 308 N.E.2d 467, 478 (1974). We can now add the "trapped trespasser" to the group of finer distinctions to which we have previously alluded.

The spirit of the sentiments expressed by Chief Judge Bazelon was recently echoed by Mr. Chief Justice Kenison in *Sargent* v. *Ross,* 113 N. H. 388, 308 A.2d 528 (1973). There, the issue was a landlord's responsibility for injuries received by a tenant's child on a stairway leading to their second-floor apartment. The landlord contended that he was not liable because he had not retained control of the stairway. Mr. Chief Justice Kenison remarked that "This 'quasi-sovereignty of the landowner' (citation omitted) finds its source in an agrarian England of the dark ages." *Id.* at 391, 308 A.2d 530. In relegating a landlor's limited liability "to the history books where it now properly belongs," the New Hampshire Court embraced the current view that where there is foreseeability of harm, landowners as well as other members of society should be subject to a reasonable duty of care to avoid it.

Within recent memory many of us have heard the times in which we live described as being the days of the "new frontier" or the "great society." Such rhetoric might be classified as campaign oratory, but the presidential lingo is apropos as this court establishes a new judicial frontier with the expectation that our actions will better today's society. The time has come to extricate ourselves from a semantical quagmire that had its beginning in ancient and misleading[4] phraseology. Mr. Justice Sutherland has emphasized the judiciary's duty to bring the common law into accord with present day standards of wisdom and justice rather than to continue with some

---

[4]Prosser comments that those decisions which hold that a social guest, no matter how cordial the host's invitation, is in law a licensee rather than an invitee makes for a "distinction which has puzzled generations of law students and even some lawyers." Prosser, *Torts* §60 at 378 (4th ed. 1971). In Connecticut by statute and in Louisiana by judicial decision the social guest is owed the same degree of care as is the invitee. C. G. S. A. §52.557a; *Alexander* v. *General Accident Fire & Life Assurance Corp.*, 98 So.2d 730 (La.App. 1957). The Ohio Supreme Court refused to place the social guests in the mold reserved for invitees but established a separate standard of care to be shown to the social guests. *Scheibel* v. *Lipton*, 156 Ohio St. 308, 102 N.E.2d 453 (1951).

Dissatisfaction with the common-law categorization is international in scope. Lord Justice Denning in *Dunster* v. *Abbott*, 2 All E.R. 1572, 1574 (C.A. 1953), in referring to the difficulties of classification as the entrant's status changes while he is on the premises said: "A canvasser who comes on your premises without your consent is a trespasser. Once he has your consent, he is a licensee. Not until you do business with him is he an invitee. Even when you have done business with him, it seems rather strange that your duty towards him should be different when he comes up to your door from what it is when he goes away. Does he change his colour in the middle of the conversation? What is the position when you discuss business with him and it comes to nothing? No confident answer can be given to these questions. Such is the morass into which the law has floundered in trying to distinguish between licensees and invitees."

Also on the international plane, the experience in France, a civil law jurisdiction which does not adhere to the common law immunities, indicates no unwarranted number of plaintiffs' verdicts. Hughes, *Duties Owed to Trespassers*, 63 Yale L.J. 633, 672-50 (1959).

outmoded and antiquated rule of the past. *Funk* v. *United States*, 290 U. S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933). The judiciary gave birth to the invitee, licensee, trespasser trio and the judiciary can lay this triptych to rest. Accordingly, we now give a final but fitting interment to the common-law categories of invitee, licensee, and trespasser as well as their extensions, exceptions, and extrapolations.

As we assign the trichotomy to the historical past, we substitute in its place the basic tort test of reasonableness. Hereafter, the common-law status of an entrant onto the land of another will no longer be determinative of the degree of care owed by the owner, but rather the question to be resolved will be whether the owner has used reasonable care for the safety of all persons reasonably expected to be upon his premises. Evidence of the status of the invitee may have some relevance to the question of liability but it no longer will be conclusive. The traditional tort question of foreseeability will become important. So, for example, whether the visitor's presence was reasonably anticipated will be a factor which the factfinder will use to evaluate the owner's conduct. The rule of law adopted here is, in keeping with our past practices, applicable to the cases at bar and to all personal injuries or property damage occurring 60 days after the filing of this opinion. This hiatus will afford all interested parties a reasonable opportunity to become aware of this opinion and to take whatever steps they deem necessary. *Haddad* v. *First Nat'l Stores, Inc.*, 109 R. I. 59, 280 A.2d 93 (1971); *Rampone* v. *Wanskuck Bldgs., Inc.*, 102 R. I. 30, 227 A.2d 586 (1967).

The plaintiff's appeals are sustained. The judgments appealed from are vacated and the cases are remitted to the Superior Court for further proceedings.

Mr. Justice Joslin, dissenting. I respectfully dissent be-

cause in my judgment this is a case calling for judicial restraint and deference to the Legislature.

Subject to certain qualifications,[1] the rule traditionally followed in this state and most jurisdictions is that a possessor of land owes no duty to a trespasser except to refrain from injuring him willfully or wantonly after discovering him in a position of peril. *Previte* v. *Wanskuck Co.*, 80 R. I. 1, 3, 90 A.2d 769, 770 (1952); *New England Pretzel Co.* v. *Palmer*, 75 R. I. 387, 394, 67 A.2d 39, 43 (1949); *Downes* v. *Silva*, 57 R. I. 343, 344, 190 A. 42, 43 (1937); *Boday* v. *New York, N.H. & H. R.R.*, 53 R. I. 207, 208, 165 A. 448 (1933). The principal reason for this immunity is that "* * * in a civilization based upon private ownership, it is considered a socially desirable policy to allow a man to use his own land in his own way, without the burden of watching for and protecting those who come there without permission or right." Prosser, *Torts* §58 at 367 (3d ed. 1964).

Yet, today's decision rejects that policy, and abandons a rule carefully developed over the centuries both here and in England. It establishes instead that negligence liability to an entrant upon land, irrespective of his status as invitee, licensee or trespasser, depends upon whether his entry was reasonably foreseeable, and, if so, whether reasonable care was used to provide for his safety.

The majority find support in several recent decisions, but none of the cases cited in fact involves an injury to

---

[1]*Haddad* v. *First Nat'l Stores, Inc.*, 109 R. I. 59, 280 A.2d 93 (1971); *Downes* v. *Silva*, 57 R. I. 343, 190 A. 42 (1937). *See also Zoubra* v. *New York, N.H. & H. R.R*, 89 R. I. 41, 48, 150 A.2d 643, 646 (1959) (Roberts, J. dissenting); 2 Restatement (Second) *Torts* §§333-339 (1965).

a trespasser.[2] The theme common to most, however, is that the immunity rule originated in feudal England, a society dominated by owners of large estates who presumably placed high importance on their freedom from concern for the safety of those entering their land without right or permission. A rule so founded, those authorities say, has little validity in today's urban industrial climate where landownership, diffused and largely residential, has less economic significance. Contemporary society, they conclude, places greater value on the lives and limbs of trespassers than on a landowner's right to the private and free use of his land.

The socio-economic rationale may be accurate, but a more realistic explanation is, I think, that the abolition of the immunity rule is part of a "* * * continual movement away from *fault* as the governing principle for allocation of losses, in favor of enterprise liability or the distribution of losses over a larger segment of society through insurance." *Smith* v. *Arbaugh's Restaurant, Inc.*, 469 F.2d 97, 101 (D.C. Cir. 1972). Irrespective of which reason underlies today's decision, the majority have made, in effect, a value judgment that it is more acceptable to our

---

[2]In *Rowland* v. *Christian*, 69 Cal.2d 108, 443 P.2d 561, 70 Cal. Rptr. 97 (1968), a tenant's social guest was injured while using a faulty bathroom fixture, which defect had been reported to the landlord-defendant; in *Pickard* v. *City & County of Honolulu*, 51 Hawaii 134, 452 P.2d 445 (1969), a licensee was injured when he unexpectedly fell through a hole in the floor in the restroom of the defendant's courthouse; in *Mile High Fence Co.* v. *Radovich*, 175 Colo. 537, 489 P.2d 308 (1971), an on-duty police officer, who the defendant argued was a licensee, sustained injury when he walked down an alley in the course of his work and stepped into an unprotected fence hole dug by the defendant; in *Smith* v. *Arbaugh's Restaurant, Inc.*, 469 F.2d 97 (D.C. Cir. 1972), a building inspector was injured while examining the barbecue kitchen in the defendant's restaurant. *See also Sargent* v. *Ross*, 113 N. H. 388, 308 A.2d 528 (1973), where the plaintiff-tenant's 4-year-old daughter lost her life when she fell from the defendant-landlord's outdoor stairway.

society that the risk of loss due to foreseeable injury sustained by a trespasser while on another's land—in any event a slight and readily insurable risk[3]—be shifted from him to the land's possessor.

If that judgment were premised more upon legal analysis and persuasive precedent and less upon presumed public acceptability, I would abide by my concurring opinion in *Henry* v. *J. W. Eshelman & Sons*, 99 R. I. 518, 527, 209 A.2d 46, 51 (1965). There I said that "[w]hile a deferral to the Legislature in the initiation of changes in matters affecting public policy may often be appropriate, it is not required where the concept demanding change is judicial in its origins." But the majority's decision is not so premised. Instead, it rests purely on what in their judgment is a socially desirable policy.

Under these circumstances, I think that judgment should have been left to legislators who are certainly in a better position than judges to gauge the public sentiment, including that of the tens of thousands of homeowners in this state. If the majority are correct in their assessment of the social attitude, I have confidence that our Legislature would react as did the British Parliament in 1957, when it resolved a similar question by abrogating the distinction between licensees and invitees and declaring that a land occupier owes the same duty of care to both. Occupier's Liability Act, 5 & 6 Eliz. II, c. 31 (1957).

*Max Wistow*, for plaintiff.

*Martin M. Zucker*, for defendants.

---

[3] 2 Harper & James, *Torts* §27.3 at 1438 (1956).