STATE

v.

**Frederick PORTER.**

No. 80–99–C.A.

Supreme Court of Rhode Island.

Dec. 11, 1981.

Dennis J. Roberts, II, Atty. Gen., James P. Renaldo, Sp. Asst. Atty. Gen., for plaintiff.

Schreiber Law Associates, Ira L. Schreiber, Providence, Sharp, Randolph & Green, A. Raymond Randolph, Jr., Richard A. Kaplan, Washington, D.C., for defendant.

OPINION

KELLEHER, Justice.

This case involves yet another facet of the criminal proceedings arising out of a 1977 narcotics investigation at the Carlton House Motor Inn. On two prior occasions we ruled on the legality of particular police conduct that occurred during the investigation. *See State v. Bennett*, R.I., 430 A.2d 424 (1981), and *State v. Alexander*, R.I., 433 A.2d 965 (1981). In the instant case the state appeals from an order suppressing evidence that consists of thirty pounds of marijuana.

Officers of the narcotics squad of the Warwick police department commenced the investigation on August 14, 1977, after receiving information about possible illegal drug activities taking place in room 249 of the motel. Early in their surveillance, the officers observed several individuals enter room 249 and leave after staying only a few minutes. They next observed an individual, later identified as Patrick Alexander, leave room 140 carrying a brown paper bag. He proceeded up the stairway to the second floor of the building and entered room 249. Another individual, subsequently identified as James Bennett, drove onto the motel grounds, parked his vehicle, and went directly to room 249. Within a few minutes, Bennett reappeared with a brown paper bag similar to the one Alexander had carried from room 140. The police ordered Bennett to stop, whereupon he dropped the bag and attempted to flee. He was arrested, and the bag was retrieved. Relying on their inspection of its contents, the officers concluded that the bag contained marijuana.

When apprehended, Bennett stated that he had been paid to pick up a sample of marijuana and deliver it to someone in New York. He also referred to the individuals in room 249 as the "big guys" of the drug operation. The officers removed Bennett from the premises. They then went to the motel office to inquire about the persons who had rented rooms 140 and 249. They learned that room 140 was registered to Alexander and room 249 to Frederick Porter, both of whom were out-of-state residents. The surveillance team arrested the occupants of room 249: Tracy Boyd, Patrick Alexander, and Frederick Porter. As a result of a warrantless search of the room, the police seized three firearms. They did not, however, discover a brown paper bag similar to the one Alexander had brought into the room.

The occupants of room 249 were secured, and members of the investigating team proceeded to room 140. Finding the door slightly ajar, they entered the room. A warrantless search of this room resulted in the seizure of the thirty pounds of marijuana. The contraband had been wrapped in an opaque plastic trash bag and was discovered in a suitcase found in the room.

Alexander and Porter were charged with possession with intent to deliver a controlled substance, to wit, thirty pounds of marijuana, in violation of G.L.1956 (1968 Reenactment) § 21–28–4.01(A)(2)(a), as amended by P.L.1974, ch. 183, § 2. On December 3, 1979, the trial justice granted the pretrial motions of defendants Alexander and Porter to suppress certain evidence obtained from room 249 and all evidence seized from room 140 as the fruits of unlawful, warrantless searches. The state challenges only that portion of the order relating to the thirty pounds of marijuana.

We recently affirmed the order suppressing the evidence seized from room 140 in the state's case against Alexander. *State v. Alexander*, R.I., 433 A.2d 965 (1981). With regard to defendant Porter, the state contends that the trial justice erred in holding that Porter had standing under the rule in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to challenge the admissibility of evidence seized from room 140. We agree.

The *Jones* Court adopted a Fourth Amendment rule of "automatic standing" for persons charged with crimes in which possession is an essential element of the offense. Prior to *Jones*, an accused was required to demonstrate a possessory interest in the premises searched or the property seized in order to establish the requisite standing to challenge the admissibility of evidence obtained. However, if an accused admitted possession, the prosecution was then free to offer the admission at trial as evidence of the alleged crime. The auto-matic-standing rule was designed to remedy this predicament then faced by an accused. *Jones v. United States*, 362 U.S. at 263, 80 S.Ct. at 732, 4 L.Ed.2d at 703. The Court also granted automatic standing to persons legitimately on the premises searched. *Id.* at 267, 80 S.Ct. at 734, 4 L.Ed.2d at 706.

Eight years after *Jones*, the Supreme Court held that the testimony of an accused at a suppression hearing could not be used against the accused at the trial upon the merits. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This court construed the *Simmons* decision as eliminating the "sole purpose for giving automatic standing to an accused possessor * * *. *State v. Jardine*, 110 R.I. 491, 495, 293 A.2d 901, 903 (1972); *accord, United States v. Hunter*, 550 F.2d 1066, 1073–74 (6th Cir. 1977); *see also United States v. Salvucci*, 448 U.S. 83, 89–90, 100 S.Ct. 2547, 2551, 65 L.Ed.2d 619, 626 (1980).[1]

Last year the Supreme Court formally overruled *Jones*, abolishing the automatic-standing rule. *United States v. Salvucci, supra.* The Court reasoned:

"The person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation. As we hold today in *Rawlings v. Kentucky, post*, p. 98 [448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633], legal possession of a seized good is not a proxy for determining whether the owner had a Fourth Amendment interest for it does not invariably represent the protected Fourth Amendment interest.

\* \* \* \* \* \*

"We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." (Footnote omitted.) 448 U.S. at 91–92, 100 S.Ct. at 2552–53, 65 L.Ed.2d at 627–28.

1. The alternative basis for granting automatic standing to anyone "legitimately on the premises" has since been narrowed to encompass only those persons having a legitimate expectation of privacy in the premises searched or the property seized. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *reh. denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); *see State v. Cortellesso*, R.I., 417 A.2d 299, 301–02 (1980).

Porter acknowledges the holding of *Salvucci* but argues that it should not be retroactively applied so as to deny him standing. We need not address his retroactivity argument at this juncture because, even assuming the viability of the *Jones* rule today, it would not grant Porter the necessary standing to challenge the search and seizure of evidence from Alexander's room.

 Fourth Amendment rights are personal rights not to be vicariously asserted by a codefendant merely because he or she may be aggrieved by the introduction of damaging evidence. *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468, 474 (1980); *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176, 185–86 (1968). As early as 1972 we recognized that *Jones* does not extend "the requisite standing to an interloper, a trespasser or one who should have no reasonable expectation of privacy in the premises" searched or the evidence seized. *State v. Jardine*, 110 R.I. at 495, 293 A.2d at 903. *See also Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The burden of establishing the requisite standing to challenge the admissibility of evidence seized rests squarely on the defendant. *Rakas v. Illinois*, 439 U.S. 128, 130–31 n.1, 99 S.Ct. 421, 424 n.1, 58 L.Ed.2d 387, 393 n.1 (1978); *State v. Cortellesso*, 417 A.2d at 301; *State v. Jardine*, 110 R.I. at 495, 293 A.2d at 903.

In our opinion, Porter's predicament is analogous to that faced by the defendants in *State v. Jardine* and the more recent *Rawlings v. Kentucky*, both *supra*. Jardine sought to suppress evidence, stolen property, seized from the apartment of a friend. At the suppression hearing, he offered no evidence to show that the property had been stored at his friend's apartment under circumstances that would give rise to his legitimate expectation of privacy in the premises. Moreover, his friend testified that Jardine did not have permission to use the apartment and had never been given a key to the premises. *State v. Jardine*, 110 R.I. at 495, 293 A.2d at 903.

In *Rawlings*, the police obtained a warrant to search the house in which the defendant had been staying. At the time of the search, the defendant was seated on a couch in the living room next to his female friend. The police ordered the woman to empty her purse, which had been lying on the couch between herself and the defendant. Among the contents of the purse were a jar containing numerous LSD tablets and several vials of other assorted controlled substances. The woman told the defendant " 'to take what was his,' " and he immediately claimed ownership of the illegal drugs. *Rawlings v. Kentucky*, 448 U.S. at 101, 100 S.Ct. at 2559, 65 L.Ed.2d at 639. The defendant testified that with the consent of his friend, he had placed the drugs in the purse on the morning of the day of his arrest.

As in the case at bar, the search in *Rawlings*, which took place in 1976, came before the *Jones* rule of automatic standing was formally abolished. On these facts the Court determined that the defendant failed to establish that his legitimate or reasonable expectations of privacy were violated by the search and seizure of the contraband from his friend's purse.

 In the instant case, Porter offered no evidence at the suppression hearing indicating that the suitcase containing the marijuana either belonged to him or was being kept in Alexander's room under circumstances that would warrant his reasonable expectation of privacy in its contents. As for the room itself, he never alleged to have a key to the room or the authority to use it. Furthermore, the record demonstrates that Porter was never observed entering or exiting room 140 during the course of the surveillance. On these facts, therefore, we find that Porter has no standing to challenge directly the seizure of evidence from room 140.

 We now turn to Porter's claim that the *Salvucci* decision should not be given retrospective application. A prospective-only approach to the operation of a judicial decision is the exception rather than the rule. Porter, therefore, bears the burden of

demonstrating that such limited application of *Salvucci* is warranted. *NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 757 (7th Cir. 1981); *Cash v. Califano*, 621 F.2d 626, 628 (4th Cir. 1980); *see also Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296, 305–06 (1971).

■ To resolve questions of retroactivity in the context of criminal proceedings, we are guided by the criteria set forth in *Linkletter v. Walker*, 381 U.S. 618, 636–37, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601, 612 (1965). They are (1) the purpose of the new rule, (2) the extent of reliance by law-enforcement authorities on the old doctrine, and (3) the effect of retroactive application on the administration of justice. *See State v. Arpin*, R.I., 410 A.2d 1340, 1348 (1980); *see also Desist v. United States*, 394 U.S. 244, 249, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248, 255 (1969); *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203 (1967). Among these factors, the purpose of the new rule is of paramount importance. *Desist v. United States*, 394 U.S. at 249, 89 S.Ct. at 1033, 22 L.Ed.2d at 255.

■ Under this test, Porter has failed to meet his burden to demonstrate that *Salvucci* should not be given full retroactive effect. We are of the opinion that the Court's purpose in overruling *Jones* was to acknowledge formally the complete erosion of the underpinnings of the rule in light of the *Simmons* and the *Rakas* decisions. As discussed, the automatic-standing rule represented a sharp departure from the well-settled principle that only persons who have themselves been the victim of an invasion of privacy can challenge the legality of a search as a basis for suppressing otherwise relevant evidence. Decisions of the Court subsequent to *Jones* have firmly adhered to this requirement. *See e.g., United States v. Payner*, 447 U.S. at 731, 100 S.Ct. at 2444, 65 L.Ed.2d at 474; *Rakas v. Illinois*, 439 U.S. at 133–34, 99 S.Ct. at 425–26, 58 L.Ed.2d at 394–95; *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 214 (1973); *Alderman v. United States*, 394 U.S. at 174, 89 S.Ct. at 966–67, 22 L.Ed.2d at 187. Hence, *Salvucci* brought the law of standing for possessory crimes into harmony with Fourth Amendment jurisprudence as it had evolved during the twenty-one years that elapsed since the rule was announced. Retrospective operation of the *Salvucci* ruling, therefore, would only further enhance this purpose.

We need not dwell on the second criterion because we are not confronted here with a situation in which law-enforcement officers relied on a prior constitutional rule under which the search in question would have been legal. It cannot be disputed that Porter's standing or lack thereof in no way influenced the investigating team in its decision to search Alexander's room.[2]

With regard to the third factor, we can discern no detrimental impact on the administration of justice which would result from retrospective operation of *Salvucci*. Contrary to Porter's contention, where a defendant has relied upon *Jones* as the sole basis for standing, it generally will not be

---

2. This reliance factor, absent in the case at bar, has been a predominant reason for the prospective application of certain new rulings of criminal procedure rendered by both the United States Supreme Court and this court. *See, e.g., United States v. Peltier*, 422 U.S. 531, 541–42, 95 S.Ct. 2313, 2319–20, 45 L.Ed.2d 374, 383–84 (1975) (*Almeida-Sanchez* ruling to be applied nonretroactively because of authorities' reliance on former rulings upholding similar border search); *Williams v. United States*, 401 U.S. 646, 656, 91 S.Ct. 1148, 1154, 28 L.Ed.2d 388, 397 (1971) (*Chimel* ruling limited to prospective application because authorities relied on prior law in believing their conduct legal); *Desist v. United States*, 394 U.S. 244, 250–51, 89 S.Ct. 1030, 1034–35, 22 L.Ed.2d 248, 255–56 (1969) (ruling in *Katz* not retroactive because it departed from prior holdings of Court on which police relied); *Johnson v. New Jersey*, 384 U.S. 719, 731–32, 86 S.Ct. 1772, 1780, 16 L.Ed.2d 882, 891 (1966) (*Escobedo* and *Miranda* rules not retroactive because law-enforcement officers did not have fair notice); *State v. Arpin*, R.I., 410 A.2d 1340, 1348 (1980) (ALI Model Penal Code insanity test adopted in *Johnson II* applies prospectively because of reliance placed by all parties on former *M'Naghten* rule); *Bishop v. Langlois*, 106 R.I. 56, 64, 256 A.2d 20, 24 (1969) (*Cole* ruling relating to nolo contendere pleas not retroactive in light of reliance by courts and defendants on prior practice).

necessary to remand the proceedings for a hearing to determine if the defendant's expectation of privacy was violated by the search and seizure being contested. Certainly, no basis for a remand is presented in the proceedings before us. The *Simmons v. United States* decision, 390 U.S. at 389–90, 88 S.Ct. at 973–74, 19 L.Ed.2d at 1256–57, as well as our remarks in *State v. Jardine*, 110 R.I. at 495, 293 A.2d at 903, adequately apprised Porter (as well as other defendants) of his burden to demonstrate at the suppression hearing that his own Fourth Amendment rights had been infringed. In *Rakas v. Illinois*, 439 U.S. at 130–31 n.1, 99 S.Ct. at 424 n.1, 58 L.Ed.2d at 393 n.1, the Court similarly responded to the petitioners' argument that their cause be remanded for further proceedings on the question of ownership of the evidence seized from the automobile in which they were passengers.

"We reject petitioners' suggestion. The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. * * * The prosecutor argued that petitioners lacked standing to challenge the search because they did not own the rifle, the shells or the automobile. Petitioners did not contest the factual predicates of the prosecutor's argument and instead, simply stated that they were not required to prove ownership to object to the search. * * * The prosecutor's argument gave petitioners notice that they were to be put to their proof on any issue as to which they had the burden, and because of their failure to assert ownership, we must assume, for purposes of our review, that petitioners do not own the rifle or the shells." [Citations omitted.] *Id.* at 131 n.1, 99 S.Ct. at 424 n.1, 58 L.Ed.2d at 393 n.1.

Moreover, commencing with the *Simmons* opinion, the demise of the rule was foreshadowed long before its formal overruling. In light of this forewarning and the ample notice Porter had received at the time of the suppression hearing by virtue of the government's challenge to his standing on the ground that his own Fourth Amendment rights were not implicated in the search, Porter cannot now be heard to complain that retroactive application of *Salvucci* would be inequitable. For this reason, *United States v. Ross*, 655 F.2d 1159 (D.C. Cir.1981), which Porter cites in support of his argument, is inapposite. The evidence sought to be suppressed in *Ross* had been obtained through a warrantless search of the trunk of the defendant's car. Hence, the defendant in that case would have standing to challenge the admissibility of the evidence seized, even in the absence of the *Jones* rule, under *Rawlings* and *Jardine.* See also *State v. Frazier*, R.I., 421 A.2d 546, 548–49 (1980).

Ross did not testify at the suppression hearing, and the government offered no objection to his silence. When he lost his suppression motion, Ross defended at trial by denying any knowledge of the incriminating evidence found in the trunk of his car. On these facts the Court of Appeals for the District of Columbia concluded that it would be unfair to permit the government to saddle Ross with the *Salvucci* rule by its assertion, raised for the first time on appeal, that his silence at the suppression hearing, coupled with his trial tactic, constituted a forfeiture of any claim that his *own* Fourth Amendment rights were violated. *United States v. Ross*, 655 F.2d at 1165.

A final, and perhaps most persuasive point, is the implicit retroactive application of the *Salvucci* ruling by the United States Supreme Court on the very same day the decision was rendered. In *Rawlings v. Kentucky*, 448 U.S. at 103 n.2, 100 S.Ct. at 2560 n.2, 65 L.Ed.2d at 641 n.2, the defendant relied on the *Jones* rule for standing to challenge the legality of a 1976 search. Dismissing such reliance, the Court stated:

"Petitioner also claims that he is entitled to 'automatic standing' to contest the legality of the search that uncovered the drugs. *See Jones v. United States*, 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697] (1960). Our decision today in *United States v. Salvucci, ante*, p. 83 [448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619], disposes of this contention adversely to him."

*Id.* at 103 n.2, 100 S.Ct. at 2560 n.2, 65 L.Ed.2d at 641 n.2.

■ Porter also asserts an alternative basis for standing predicated upon the fruit-of-the-poisonous-tree doctrine. As indicated, the trial justice suppressed certain evidence obtained as a result of an illegal search of room 249, and the state has not appealed this ruling. If the legality of this search were an issue presently before us, Porter clearly would have standing to challenge the search because this room was registered in his name and he had a reasonable expectation of privacy in the premises. Porter argues that the failure to locate any marijuana inside room 249 served as the impetus for the surveillance team's subsequent search of room 140. Thus, *a fortiori,* he has standing to challenge the seizure of evidence from room 140 as the tainted fruits of the earlier illegal search of his room.

Had the attention of the investigating officers in fact been drawn to room 140 as a direct result of their search of Porter's room and had the evidence seized been obtained by exploitation of this earlier illegality, we might give credence to this argument. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963); *State v. Bailey,* R.I., 417 A.2d 915, 919 (1980). But, to quote an apt phrase, we think Porter is barking up the wrong tree.

Initially, we note the record indicates that the officers' interest in room 140 stems in part from events observed which were entirely independent of the search of room 249. Sergeant James Godbout, a member of the investigating team, testified at the suppression hearing that he noticed several individuals enter room 249. After seeing these individuals (who stayed only two to three minutes) leaving the room, he next observed Alexander exit room 140 with a brown paper bag and enter room 249. This observation was made before the entry and search of room 249. The record also suggests that a man may have been seen fleeing from room 140 while the police were escorting the arrested occupants of room 249 from the premises.[3]

Even if one were to consider the observation of Alexander's travel from room 140 to room 249 not a cognizable, independent link to room 140 because the police did not know at the time that the bag Alexander carried contained marijuana, Porter's argument must still fail. In our opinion, if there is any poisonous tree to which the tainted fruits of room 140 can be attributed, that tree is the arrest of James Bennett leading to the seizure of the brown paper bag he carried. In *State v. Bennett, supra,* we held his arrest and the seizure of the bag illegal. Contrary to Porter's contentions, the record demonstrates that the decision to search room 140 was reached after Bennett's arrest and the discovery of marijuana in the bag, prior to the search of room 249.

Sergeant Godbout testified that he and Sergeant Kenneth David went to the office of the motel and spoke to the desk clerk about rooms 249 and 140 after Bennett had been removed from the motel grounds. They obtained the names of the registrants of the room (Porter and Alexander) and a master key to all the motel rooms.[4] They

---

**3.** There is considerable ambiguity in the record concerning this event. Sergeant Godbout stated that Sergeant Kenneth David, the officer in charge of the investigation, called out to the others that someone was "fleeing from the other room." He interpreted "other room" as referring to room 140. Sergeant David did not testify at the suppression hearing. Therefore, precisely which room of the motel this person fled from remains unclear. Further clouding the incident is the arrest of a motel guest staying in room 139 and the search of that room. It appears from the statement this individual gave for the arrest report that he had no involve-

ment with any of the alleged illegal activities connected to rooms 140 or 249.

**4.** In his brief, Porter notes that there is conflicting testimony about the sequence of these events. He refers to the transcript of a probable-cause hearing, quoting Sergeant David as stating that he and Sergeant Godbout talked with the desk clerk "after the people had been apprehended." Neither the transcript of the probable-cause hearing nor relevant portions thereof was appended to defendant's brief. Indeed, Porter acknowledges in his brief that he is not relying on this testimony for purposes of this appeal. Hence, since the record before us

then proceeded to room 249. Furthermore, in response to a question posed during the suppression hearing regarding the investigating team's purpose in going to room 140 after their search of room 249, Detective Raymond Theisler (also a member of the team) stated: "It was brought out that a subject had left room 140 carrying a brown paper bag. The subject arrested in the parking lot [James Bennett] had a similar-type bag that had marijuana, what they believed to be marijuana, in it."

Porter was not in the immediate vicinity where Bennett was arrested, and he does not claim any interest in the bag Bennett carried. Therefore, Porter's Fourth Amendment rights were in no way violated by the illegal arrest of Bennett and seizure of the bag he was carrying. *See Alderman v. United States, supra.* Thus, the doctrine of the fruit of the poisonous tree is of no avail to Porter in conferring standing to contest the admissibility of evidence seized from room 140.

The state's appeal is sustained, the order of suppression appealed from is vacated, and the case is remanded to the Superior Court for further proceedings.

contains only the uncontradicted suppression-hearing testimony of Sergeant Godbout, his version of the sequence of these events is controlling.