**Warren R. WOLF, in His Capacity as Administrator of the Estate of Brendan L. Houle, et al.**

v.

**NATIONAL RAILROAD PASSENGER CORP., d.b.a. Amtrak, et al.**

**No. 95–168–Appeal.**

Supreme Court of Rhode Island.

July 11, 1997.

Amato A. Deluca, Mercedes Deines, Providence, John G.F. Ruggieri, for Plaintiff.

Paul E. Dwyer, Jr., Raymond A. LaFazia, Paul V. Gallogly, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

A terrible tragedy hangs heavy over this tale of woe. William J. Houle (Houle) had warned his son, twelve-year-old Brendan, about the dangers they would face when they attempted to traverse a train trestle at night over a body of water. On a clear spring evening in 1990, Houle took his two sons out for a ramble on the train trestle that spans Apponaug Cove in Warwick. Brendan, the younger of Houle's sons, was unable to restrain himself and stay close to his father as they passed over the water. He soon dashed ahead on the tracks and thereby fatally exposed himself to the very danger about which his father had warned him. Unfortunately Houle then had to watch in mortal dismay as his son perished before his eyes when he was unable to outrun an oncoming Amtrak train. For the reasons that follow, we now affirm a summary judgment that dismissed the claims arising out of this calamity.

## Background

The plaintiff, Warren R. Wolf (Wolf), in his capacity as administrator of the estate of Brendan L. Houle (Brendan), appeals from a final judgment entered in favor of defendants, National Railroad Passenger Corp., d.b.a. Amtrak, and Bernard J. McGovern (engineer McGovern) (collectively Amtrak), after they successfully moved for summary judgment. Wolf seeks to recover for the alleged wrongful death of twelve-year-old Brendan, who was killed by an oncoming train on a trestle above Apponaug Cove while he was walking there with his father and his brother one spring night in 1990. Because our de novo review of the record reveals that there were no genuine issues of material fact and that the motion justice applied the correct legal standard to the undisputed facts, we affirm the granting of Amtrak's summary-judgment motion and the entry of final judgment in its favor.

Early in the morning on a mid-spring day in 1990, Amtrak passenger train No. 94 left the Newport News, Virginia railway station, bound northward for New England. While the train steadily wound its way on a journey that would take it through Rhode Island and then on to Boston, Houle and his nineteen-year-old son, James Houle (James), were at work in Houle's store in Providence. At about ten of eight that evening, Houle and James closed up shop, hopped in Houle's car, and picked up Brendan in Warwick. Houle

planned to take his two sons to a video arcade.

While driving to the arcade on that fateful evening, however, Houle decided on the spur of the moment to turn down a dirt road leading to a small parking area at the base of the Apponaug Cove train trestle. Two train tracks running north and south loomed above them atop the trestle, each separated by a four-foot-high divider. In years past, Houle had taken his older son, James, to the waterfront area by the trestle where they would perambulate and skip rocks over the cove's calm waters. But this night was one of those rare occasions when Houle had both of his boys with him, and he thought it would be nice for them to spend some time together down by the cove.

The trio spent a few minutes skimming rocks along the water before Houle suggested that they cross over the trestle to walk around on the other side of the cove. He warned his offspring about the possibility of encountering a train and how they should fly off the track if one should appear. Father and sons then scaled the steep embankment on a well-worn path and started to head south across the trestle from its northern end. Although no signs warned them about the danger of approaching trains and no fence impeded their access to the trestle, they joked about the possibility of a train's coming while they were en route. Perhaps in his excitement and in his eagerness to get to the other side, Brendan ran ahead of the others. James, the older teenager, lagged a distance behind him, and Houle brought up the rear as they trekked across the trestle.

Suddenly a shrill whistle pierced the night. Frantically looking up and down the tracks to locate the source of their shared terror, the trio soon caught sight of a northbound train that suddenly careened into view around a blind bend approximately 1,000 feet from the northern end of the trestle where they had begun their walk. Hurtling through the dusk at seventy-five miles per hour, it charged at them head on from the south. Houle, closest to the northern end of the trestle, turned on his heel and sprinted quickly out of harm's way off the trestle's northern end. James spun around and bolted north, screaming, "Train!" before he too was able to dive off the end of the trestle. Thus in a few seconds only Brendan was left on the tracks, running for his life while No. 94 pitilessly bore down on him. Having glimpsed the commotion on the track ahead, engineer McGovern sounded the train's whistle and activated the emergency brakes, but the trestle proved a bridge too far for Brendan to recross. Caught too close to the trestle's southern end, he was unable to retrace his steps in time to evade the train. With his father and brother still shouting at him, Brendan was within ten feet of the end of the trestle when the train overtook him.

■ In due course, after having been appointed to administer Brendan's estate, Wolf filed a timely wrongful-death suit in Kent County Superior Court against Amtrak and engineer McGovern, alleging essentially negligent design and maintenance of the railroad trestle and its surrounding area.[1] After engaging in discovery, Amtrak moved for summary judgment on the basis of this

---

1. Wolf also filed suit against Houle for negligent supervision, a claim that is not before us. Moreover, others joined Wolf as plaintiffs, including Kathleen A. Houle, Brendan's mother, who sued for loss of consortium; and James, who sued for damages resulting from his having witnessed the accident. Although it is of procedural significance only (given our affirmance of the final judgment entered in favor of defendants), we note that these additional plaintiffs (contrary to Wolf's references in his brief to them as "appellants") did not in fact perfect their purported appeal from the final judgment. As we recently reiterated in *Hennessey v. Pyne*, 694 A.2d 691 (R.I.1997), the payment of a filing fee by a particular party appellant affords that party alone an appeal. Where there are multiple aggrieved parties who seek to appeal, each must pay a separate filing fee to prosecute their appeals properly. Sup.Ct. R. 5(a). The failure to do so, in the absence of excusal, will almost invariably result in the loss of that party's right to appeal. And it does not matter that the appeal is prosecuted by one attorney on behalf of multiple parties. The number of attorneys representing the parties purporting to appeal does not dictate the number of filing fees that must be paid or the number of notices of appeal that must be filed. Rather, it is the number of separate parties appealing that controls the number of filing fees that must be paid, *see* Sup.Ct. R. 5(a) (calling for a separate filing fee for each appellant), and (in the absence of a joint appeal) the number of notices of appeal that must be filed, *see* Sup.Ct. R. 3.

court's decision in *Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056 (R.I. 1994). There we abandoned the court's nineteen-year experiment with a new-premises liability rule, first announced in *Mariorenzi v. Joseph DiPonte, Inc.,* 114 R.I. 294, 333 A.2d 127 (1975), that required property owners to exercise due care toward all persons reasonably expected to be on the premises, regardless of their common-law status when they entered the property. In *Tantimonico* we returned to the previous common-law rule that property owners owe trespassers "no duty save to refrain from willful or wanton injury." 637 A.2d at 1061.

The plaintiffs argued below that *Tantimonico,* decided in 1994, should not retroactively be applied to their claims, which arose in 1990 when *Mariorenzi* was still the law. The motion justice disagreed, concluding that *Tantimonico* should be applied retroactively to all pending claims. She also found that there was no material issue of fact regarding Brendan's status as a trespasser, no evidence to suggest that engineer McGovern had failed to take sufficient emergency measures, and no evidence to indicate that Amtrak had acted willfully or wantonly. Accordingly the motion justice granted Amtrak's summary-judgment motion and, pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure,[2] entered a final judgment in its favor. On appeal Wolf argues that *Tantimonico* should not have been applied retroactively and that even if it were to be so applied, there are still genuine issues of material fact that preclude the award of summary judgment.

## Analysis

 Because " 'a prospective-only approach to the operation of a judicial decision is the exception rather than the rule,' " *Landmark Medical Center v. Gauthier,* 635 A.2d 1145, 1154 (R.I.1994) (quoting *State v. Porter,* 437 A.2d 1368, 1371 (R.I.1981)); *see generally Ondis v. Pion,* 497 A.2d 13 (R.I. 1985) (collecting cases providing for prospective application), and because Wolf has not carried his burden of demonstrating that such a prospective-only application of *Tantimonico* is warranted,[3] *see State v. Porter,* 437 A.2d 1368, 1371–72 (R.I.1981), we agree that the *Tantimonico* standard was properly applied to the litigants in this case. *See Ondis,* 497 A.2d at 17 (" '[i]n the past this court has chosen to apply new rules of law in the manner best suited to serve the interests of justice and to avoid hardship' "); *State v. Arpin,* 122 R.I. 643, 656, 410 A.2d 1340, 1347 (1980) ("[i]t is well settled that the highest court of a state may choose to apply new rules of law in any manner it deems appropriate and just"). Indeed it would be particularly anomalous if the standard of care announced in *Tantimonico* and applied retroactively to the litigants in that case was not to be applied to the litigants here. If the holding in *Tantimonico* had been a candidate for a limited retroactive application, that decision would have been the most appropriate occasion to announce such a restriction. *See, e.g., Haddad v. First National Stores, Inc.,* 109 R.I. 59, 67, 280 A.2d 93, 98 (1971) (adopting attractive-nuisance doctrine to litigants in case at bar and "to all injuries * * * occurring sixty days after the date of the filing of this opinion").

Moreover, and perhaps most importantly, this is not a situation in which it was likely that the injured parties would have been acting in reliance on the old *Mariorenzi* rule when they were trespassing on Amtrak's trestle in 1990. Under *Mariorenzi* "the question to be resolved" in determining the degree of care owed by a landowner to an entrant upon the land was "whether the own-

---

2. Rule 54(b) of the Superior Court Rules of Civil Procedure provides in pertinent part as follows:

> "When more than one claim for relief is presented in an action * * * or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and

upon an express direction for the entry of judgment."

3. A prospective-only or limited retroactive application of a new judicial rule might be warranted if, for example, the injured party could establish justifiable and detrimental reliance on the old rule or show that the purposes for adopting the new rule would not be served by applying it retroactively to the case at bar.

er has used reasonable care for the safety of all persons reasonably expected to be upon [the] premises." 114 R.I. at 307, 333 A.2d at 133. Here, even Wolf does not contend that Houle and his sons were induced to trespass upon the Apponaug Cove train trestle in reliance upon what they expected would be the duty of reasonable care owed to them by the trestle's owner. Accordingly we do not believe it was inappropriate or unfair for the motion justice to have followed the general rule that applies decisions like *Tantimonico* retroactively to factual events that occurred before its announcement. This is especially true when, as here, there is a long and established common-law tradition that denies relief to injured trespassers in circumstances like these. (See cases cited, *infra.*)

■ We now turn to a consideration of whether summary judgment was properly granted to Amtrak. The first issue to be determined is whether Brendan's status at the time of the accident was that of trespasser. Even assuming the existence of a well-worn path leading up to the trestle (presumably indicative of some usage of the trestle as a pedestrian crossing), we agree with the motion justice that Brendan was still trespassing on Amtrak's trestle at the time of the accident. *See Zoubra v. New York, New Haven and Hartford Railroad Co.,* 89 R.I. 41, 44, 150 A.2d 643, 645 (1959) ("this court has long since adopted the view that in railroad cases the fact that a certain place, where there is no public right of passage, has been used by persons as a crossing does not constitute such place as a public crossing[;][n]or does it confer upon persons using it any other relation to the railroad than that of trespassers") (citing *Boday v. N.Y., N.H. & H.R.R. Co.,* 53 R.I. 207, 165 A. 448 (1933)). As such, Amtrak owed Brendan a duty to refrain from willful or wanton injury, *see Tantimonico,* 637 A.2d at 1061, after his trespass was discovered, *Zoubra,* 89 R.I. at 45, 150 A.2d at 645 ("the law does not impose upon the defendant [railroad] any duty toward the plaintiff as a trespasser * * * unless it has first discovered [him] in a position of danger"); *New England Pretzel Co. v. Palmer,* 75 R.I. 387, 394, 67 A.2d 39, 43 (1949) ("[a] railroad owes no duty to a trespasser * * * except after discovering his

peril"); *see also Erenkrantz v. Palmer,* 69 R.I. 478, 481, 35 A.2d 224, 225 (1944); *Boday,* 53 R.I. at 208, 165 A. at 448. Furthermore "'a railroad is under no duty to keep a lookout for trespassers. Their probable presence on the tracks is not such a circumstance which the law requires a railroad to anticipate and reasonably guard against.'" *Zoubra,* 89 R.I. at 45–46, 150 A.2d at 645.

■ Brendan's trespass was first discovered by engineer McGovern as the train rounded a bend in the tracks located approximately 1,000 feet from the trestle. At that point Amtrak had the duty to avoid willfully or wantonly injuring Brendan. In response to observing Brendan's nighttime presence on the tracks, engineer McGovern immediately sounded the train's whistle and engaged the emergency brakes. The train was traveling at a speed of between seventy and eighty miles per hour in a corridor that had a speed limit of ninety-five miles per hour. Given these facts, the record is devoid of any suggestion that Amtrak did anything willfully or wantonly to cause Brendan's demise. On the contrary, it appears that Amtrak did all that could reasonably be expected of it after its engineer detected Brendan on the trestle. Unfortunately there was simply not enough time for the train to stop and thereby prevent this catastrophe. Thus on these facts we are of the opinion that the motion justice properly awarded Amtrak summary judgment.

■ Finally, because the risk of injury from an oncoming train would be apparent to anyone who decides to walk along a train trestle, we hold that as a matter of law the trestle was not an "attractive nuisance." *See Haddad,* 109 R.I. at 61–67, 280 A.2d at 95–98 (discussing and adopting the attractive-nuisance doctrine); *see also Holland v. Baltimore & Ohio Railroad Co.,* 431 A.2d 597, 602 (D.C.Ct.App.1981) (en banc) ("[t]he overwhelming weight of authority in jurisdictions across the country is that the attractive nuisance exception does not apply as a matter of law in cases where child trespassers are injured by moving trains"); *Brownfield v. Missouri Pacific Railroad Co.,* 794 S.W.2d 773, 777 (Tex.Ct.App.1990, writ denied) ("[a]n or-

dinary railroad trestle is certainly not * * * 'well within' the boundaries of attractive nuisance"). The obvious danger to prospective trespassers posed by a trestle like this one— a deathtrap consisting of tracks separated by a four-foot-high wall, passing above a body of water, surrounded by open airspace—is at least as great as that presented by a crossing. This court has previously recognized the dangers posed by railroad crossings that, unlike this trestle, are usually surrounded by terra firma on all sides. *See Francis v. Atlantic Terminals, Inc.*, 104 R.I. 346, 350, 244 A.2d 415, 417 (1968) (a railroad crossing "is a place of great danger"); *Kennedy v. N.Y., N.H. & H.R.R. Co.*, 43 R.I. 358, 362, 112 A. 429, 431 (1921) ("[i]t is well known that a railroad crossing is a place of great danger"). Having discussed in advance possible ways to extricate themselves in the event they should encounter a train, father and sons were all well aware of the extremely parlous situation in which they had voluntarily placed themselves. Thus, because Brendan must be deemed to have realized the risk of what he was doing, the attractive-nuisance doctrine is inapplicable.

## Conclusion

For the foregoing reasons Wolf's appeal is denied and dismissed, the award of summary judgment and the entry of final judgment in Amtrak's favor is affirmed, and the papers of this case are remanded to the Superior Court.

GOLDBERG, J., did not participate.