William G. CAIN et al.

v.

Joel JOHNSON et al.

No. 98–30–Appeal.

Supreme Court of Rhode Island.

July 25, 2000.

Ronald J. Resmini, Barrington, Kevin P. Gavin, Paul S. Cantor, Providence, for Plaintiff.

Kathleen M. Powers, Marc DeSisto, Providence, for defendant, City of Newport.

Brenda D. Baum, for defendant, State of R.I.

A. Lauriston Parks, Virginia M. McGinn, Providence, for defendant, Joel Johnson.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the plaintiffs' appeal from a summary judgment

entered in the Superior Court in favor of the defendants. For the reasons that follow, we affirm.

The facts of this case are not in dispute. At approximately 2 a.m. on August 6, 1991, Michael T. Cain (the decedent) and two friends went for a walk along a section of Newport's Cliff Walk. While walking along an area of the Cliff Walk that winds through Salve Regina University's (the university) campus, the decedent stepped from the paved walk onto a grassy area on the ocean side of the walk. He fell from the cliff to his death after the ground beneath his feet gave way.

On July 25, 1994, plaintiffs, William G. Cain and Mary H. Cain (plaintiffs or the Cains), filed a wrongful death action individually and on the part of the estate of Michael T. Cain against defendants, the City of Newport (city), the State of Rhode Island (state), and the university. The plaintiffs alleged that defendants' negligence caused the decedent's death because defendants failed to properly inspect, maintain, and repair the Cliff Walk. In September 1997, the city moved for summary judgment, arguing that the decedent was a trespasser because the Cliff Walk had closed at 9 p.m. The state and the university joined in the city's motion. On November 7, 1997, the motion justice granted summary judgment in favor of all defendants, ruling that summary judgment was required based on this Court's decision in *Brindamour v. City of Warwick*, 697 A.2d 1075 (R.I.1997) (holding that a landowner owes a trespasser only the duty to refrain from willful and wanton conduct). On November 21, 1997, the motion justice reconsidered the matter, and allowed the summary judgment to stand.

The plaintiffs then appealed the grant of summary judgment. The case was heard on the show cause calendar on March 3, 1999. After argument, the case was placed on the regular calendar with directions to the parties to provide the Court with authorities and guidance on the following issues:

"1. Would the conduct of the defendants or any of them amount to willful and wanton conduct under the facts that were presented to the motion justice in this case?

"2. Would willful and wanton conduct include reckless indifference to the safety of the plaintiffs' decedent whether or not the defendants were aware of his presence on the premises?

"3. Would the alleged conduct of the defendants or any of them rise to the level of reckless indifference to the safety of the plaintiffs' decedent in light of the nature of the defective condition which caused him to fall to his death?

"4. In the event that it was determined that the defendants or any of them directly or indirectly invited or permitted the plaintiffs' decedent to use the subject property for recreational purposes, would the duty toward him differ in any respect from that owed to a trespasser? See G.L. § 32–6–1 et seq. and particularly § 32–6–3 and § 32–6–5.

"5. In the circumstances of this case, should the question of whether the defendants' conduct amounted to willful or wanton acts or ordinary negligence be determined by the court on motion for summary judgment or should it be determined by a trier of fact?"

These issues will be discussed as they are presented, beginning with a short discussion of the *Brindamour* case on which the motion justice's ruling was based. Further facts will be supplied as may be necessary to deal with these issues.

### *Brindamour v. City of Warwick,* 697 A.2d 1075 (R.I.1997)

Colleen Marie Brindamour was killed at approximately midnight on a midsummer evening in 1993 when a car in which she was a passenger skidded off a road located within a city-owned park and slammed into a tree head-on. *See Brindamour,* 697 A.2d at 1076. Brindamour's mother, Rose Brindamour, filed suit against the City of

Warwick, alleging that the city was negligent in failing to maintain the park and its roadways in a safe manner. The park was closed at the time of the accident. *See id.* We held that because Brindamour was in the park after hours, she was a trespasser, and that the city owed to trespassers only the duty to refrain from wanton or willful conduct. *See id.* at 1077.

For purposes of this opinion, we shall assume without deciding that all three defendants had the same relationship to the decedent and that there was no distinction among them with respect to the duty owed him. We make this assumption even though counsel for the university has argued vigorously that its duty concerning the Cliff Walk was superseded by the authority exercised over the pathway by the City of Newport and by the state. We also recognize that the state has argued that its duty varied from that of the city. We do not believe that it is necessary in this context to resolve those contentions.

## I

### Was the decedent a trespasser?

Initially, plaintiffs argue that *Brindamour* does not apply, and that there is a genuine issue of material fact about whether the decedent was a trespasser at the time of the accident. Pursuant to Newport City Ordinance § 12.32.010(C), the Cliff Walk is "closed for public use between nine p.m. and six a.m. of the following day, daily, and no person shall go upon such public areas during the hours of closing * * * except that the Cliff Walk shall remain open for the purpose of access to the water for fishing." The plaintiffs argue that in *Brindamour*, it was an uncontested fact that the plaintiff was a trespasser. The plaintiffs argue, however, that in the instant case, the decedent had no way of knowing that the walk closed at a particular time every night. The plaintiffs argue that despite the fact that a city ordinance prohibits people from being on the walk after hours, unless for the purpose of fishing, only two signs posted on either end of the walk notify people of the hours that the walk is open to the public. The plaintiffs argue that such notice is insufficient, as there are numerous other unrestricted entrance points along the walk, which stretches approximately 18,000 feet along the Atlantic Ocean.

However, we recently rejected a similar argument in *Bennett v. Napolitano,* 746 A.2d 138 (R.I.2000). In *Bennett,* we held that an individual who, in violation of a city ordinance, entered a park after closing was a trespasser. *Id.* at 141. There, the plaintiff, Donald Bennett (Bennett), was walking his dogs at about 2 a.m., along a path in Roger Williams Park in Providence that he had used for about ten years, when a tree limb fell on him. Bennett filed suit against the City of Providence, alleging that the city was negligent in maintaining the park. The city filed a motion for summary judgment, arguing that Bennett was a trespasser because he was in the park after it had closed and that therefore the city owed him only the duty to refrain from willful and wanton conduct. The motion justice granted the motion and entered judgment accordingly. *See id.* at 140.

On appeal, Bennett argued that he had the implied consent of the city to use the park after hours because he had done so for a period of ten years and because he had been observed on numerous occasions by park rangers and Providence police officers, who had never asked him to leave. *See id.* We rejected plaintiff's argument. We noted that the park was closed from 9 p.m. to 7 a.m. pursuant to city ordinance, and that an "individual who enters a city park after closing is a trespasser." *Bennett,* 746 A.2d at 141. We held that local police and park rangers did not have the authority to waive the provisions of that ordinance by affirmatively or impliedly inviting people into the park after closing. To conclude otherwise would be equivalent to holding that a "landowner who does not aggressively exclude a trespasser thereby

assumes an enhanced duty of care towards the trespasser or that a driver who regularly exceeds the authorized highway speed limit while observed by law enforcement officials can claim an implied permission to speed." *Id.* at 142.

█ A strict adherence to this Court's decision in *Bennett* leads one to conclude that the decedent was a trespasser even though the Cliff Walk was not so intensively posted as to notify all possible visitors of the hours of operation. The holding in *Bennett* suggests that the existence of a city ordinance closing a park establishes as a fact that any person in the park after hours is a trespasser, even if the person is completely unaware of the ordinance. *Brindamour* and *Bennett* both clearly establish that a person in a park after it has closed is a trespasser. Because the decedent was on the Cliff Walk at about 2 a.m., he was a trespasser as a matter of law. We shall now turn to the questions raised by the Court.

## II

### The willful and wanton standard

The first and the second questions posed by the Court are interrelated, and, therefore, will be discussed together. These questions ask whether defendants' conduct rises to the level of willful and wanton conduct (question 1), and whether the duty to refrain from willful and wanton conduct arises before or after the trespasser is discovered (question 2).

█ Under Rhode Island law, it is well settled that a landowner owes a trespasser no duty except to refrain from willful or wanton conduct. *See Bennett,* 746 A.2d at 142; *Brindamour,* 697 A.2d at 1077; *Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056, 1061 (R.I.1994). It is also well settled that such a duty arises only after a trespasser is discovered in a position of danger. *See Wolf v. National Railroad Passenger Corp.,* 697 A.2d 1082, 1086 (R.I.1997); *Zoubra v. New York, New Haven and Hartford Railroad Co.,* 89 R.I.

41, 44, 150 A.2d 643, 644–45 (1959); *New England Pretzel Co. v. Palmer,* 75 R.I. 387, 394, 67 A.2d 39, 43 (1949).

In *Wolf,* 697 A.2d at 1084, a young boy suffered fatal injuries when he was struck by a train as he was attempting to cross a trestle that spanned an inlet of the Narragansett Bay. The plaintiff, Warren Wolf, the administrator of the young boy's estate, filed a wrongful-death action against the railroad and its engineer, alleging negligent design and maintenance of the railroad trestle and its surrounding areas. The railroad moved for summary judgment, arguing that the boy was a trespasser, and accordingly, the railroad owed him only a duty to refrain from willful and wanton injury. *See id.* at 1084–85. A Superior Court justice granted the railroad's motion and entered a final judgment in its favor. *See id.* at 1085. We affirmed the judgment, holding that because the boy was a trespasser, the railroad owed him no duty except to refrain from willful or wanton injury *after his trespass was discovered. See id.* at 1086. Accordingly, the duty to refrain from willful and wanton conduct did not arise *until the boy was discovered by the railroad engineer*; by that time, however, "there was simply not enough time for the train to stop and thereby prevent this catastrophe." *Id.*

The plaintiffs argue, however, that the holding of the cases above should not be extended to the case at bar. Rather, plaintiffs urge the Court to accept the rule set forth in the Restatement (Second) *Torts,* § 334 (1965), which provides as follows:

> "A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm there caused to them by his failure to carry on an activity involving a risk of death or serious bodily harm with reasonable care for their safety."

Under plaintiffs' definition, the decedent's status as a discovered trespasser, versus an undiscovered trespasser, would be irrelevant.

Section 334 of the Restatement is analogous to the "beaten path exception" available under the common law. "The defendant in such instances is liable to a trespasser injured while using a limited area containing an unreasonable risk of harm." *Mariorenzi v. Joseph DiPonte, Inc.*, 114 R.I. 294, 302 n. 2, 333 A.2d 127, 131 n. 2 (1975). This theory, which turns on a landowner's knowledge of the use of his land by trespassers, however, has not been accepted by this Court. In *Mariorenzi*, this Court eliminated the distinction that the common law drew among invitees, licensees, and trespassers. *Id.* at 307, 333 A.2d at 133. Nineteen years later, we rejected the holding of *Mariorenzi* and restored the distinction between invitees and trespassers. *See Tantimonico*, 637 A.2d at 1061. Save for the aberration of *Mariorenzi*, this Court has steadfastly held that a landowner owes a trespasser no duty until he or she is actually discovered in a position of peril. *See Wolf*, 697 A.2d at 1086; *Zoubra*, 89 R.I. at 44, 150 A.2d at 644–45; *Previte v. Wanskuck Co.*, 80 R.I. 1, 3, 90 A.2d 769, 770 (1952); *New England Pretzel Co.*, 75 R.I. at 394, 67 A.2d at 43.

For example, in *Zoubra*, the plaintiff alleged that "her presence on [the railroad] tracks in the exercise of due care on her part raised a duty on [the railroad's] part not to willfully or wantonly injure her if it 'knew or in the exercise of reasonable care would have known' of her presence." *Zoubra*, 89 R.I. at 45, 150 A.2d at 645. The majority held, however, in sustaining the trial court, which found the declaration insufficient as a matter of law, that the law does not impose upon a landowner any duty toward a trespasser unless it has first discovered *him* or *her* in a position of peril, even though there was an allegation that the defendant knew or should have known of the presence of people on the crossing.

We held that a landowner is " 'under no duty to keep a lookout for trespassers. Their probable presence on the tracks is not such a circumstance which the law requires a railroad to anticipate and reasonably guard against.' " *Id.* at 45–46, 150 A.2d at 645; *see also Wolf*, 697 A.2d at 1086.

The plaintiffs also argue that the holdings of the cases cited above are specific to railroad trespassers, and that they do not apply to the instant case. This argument, however, cannot be accepted. We are not persuaded that this Court should promulgate special rules for different types of landowners. Such fragmentation of duties would create chaos in the attempted application of rules wherein consistency is essential.

Furthermore, although the above cases relate specifically to railroad properties, support for extending the proposition beyond railroad cases exists in G.L.1956 § 32–6–5 and in previous decisions of this Court. Section 32–6–5, a provision of the Public Use of Private Lands statute, provides in pertinent part as follows:

"(a) Nothing in this chapter limits in any way any liability which, but for this chapter, otherwise exists:

"(1) For the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity *after discovering the user's peril* * * *." (Emphasis added.)

Under Rhode Island statutory law, a landowner owes no duty to a trespasser unless the trespasser first is discovered in a position of peril. Even though this statute may not apply to the public entities involved in the case at bar, it represents a considered policy adopted by our legislature and applies to all types of recreational property.

This Court also has specifically applied the holding of the railroad cases outside of the railroad context. *See Tantimonico*, 637 A.2d at 1057; *Previte*, 80 R.I. at 3, 90 A.2d at 770. In *Previte*, for exam-

ple, a wrongful-death action brought by the parents of a young boy who drowned in a pond in Providence, this Court held that "no duty is owed a trespasser by a landowner except to refrain from injuring him wantonly or wilfully after discovering his peril. * * * [W]e see no legal duty imposed on defendant to anticipate the presence of plaintiffs' son as a trespasser on its property." *Id.* at 3–4, 90 A.2d at 770.[1] Based on the foregoing authorities, it is clear that a landowner does not owe a trespasser any duty until after the trespasser is discovered in a position of peril. Once the trespasser is discovered, the landowner owes the trespasser a duty to refrain from willfully or wantonly injuring the trespasser. Because the decedent in the instant case never was discovered in a position of peril, we need not consider whether defendants' conduct rose to the level of willful and wanton conduct. The defendants did not owe the decedent any duty.

## III

### The nature of the defective condition of the land

The third question posed by the Court asks whether liability arises in light of the nature of the defective condition of the land. The plaintiffs argue that the overall condition that led to the decedent's death was the paved nature of the Cliff Walk. Therefore, plaintiffs argue that even though the precise area of the ground from which the decedent fell was a "natural condition" of the land, the paved nature of the walk rendered it an artificial condition, thereby imposing liability pursuant to the Restatement (Second) *Torts* § 337, which provides:

"A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily

harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespassers by his failure to exercise reasonable care to warn them of the condition if

"(a) the possessor knows or has reason to know of their presence in dangerous proximity to the condition, and

"(b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved."

The plaintiffs' argument with respect to this provision, however, must fail for two reasons—(1) because the precise area from which the decedent fell was a natural condition for which defendants could not be held liable, even if this Court were to adopt the foregoing rule, which we have hitherto declined to do, and (2) even if it were considered an artificial condition, it was a condition of such a nature that a trespasser would discover or realize the risk involved.

The area from which the decedent fell is just northeast of McCauley Hall, the university's former library. In a police report following the accident, the Newport police described the area as follows:

"I noticed there was a patch of mud measuring approx. 5′ square with numerous sneaker and footprints embedded in the mud, a cement slab which rose approx. 8″ above the mud, approx. 10″ wide on the top surface and then de[s]cended the cliff approx. 6′. The slab appeared to be approx. 7′ in length. To the immediate right (south) of the slab there was a hole in the grass which measured approx. 8″ square which appeared to be due to erosion which may have also been a factor in this incident. Judging from where the bloodstain on the rock below where the victim landed, it is possible the victim stepped in to this

---

**1.** The holding in *Previte v. Wanskuck Co.,* 80 R.I. 1, 90 A.2d 769 (1952), as it related to an infant trespasser was overruled by this Court's decision in *Haddad v. First National Stores, Inc.,* 109 R.I. 59, 64–65, 280 A.2d 93, 96–97 (1971), in which we adopted the attractive nuisance doctrine. Nevertheless, the Court in *Previte* faithfully expounded the common law rule concerning all trespassers.

small hole which would have placed him in the logical trajectory to land where the bloodstain appeared."

The report was accompanied by photographs of the cliff, taken from both the top of the cliff and from the water. Those photographs clearly show a muddy area of earth distinct from the paved path. Further investigation revealed that there had been heavy rains during the preceding weekend that had made the area muddy and slippery.

The area from which the decedent fell is clearly a natural condition of the land. With respect to the duty of care owed by a landowner for natural conditions on the land, we have held that

> "the possessor of land owed a trespasser 'no duty to discover, remedy, or warn of dangerous natural conditions. Perhaps if the possessor sees a trespasser about to encounter extreme danger from such a source, which is known to the possessor and perceptibly *not* known to the trespasser, there may be a duty to warn (as by shouting). That is about as far as the bystander's duty to a highway traveler would traditionally go, if indeed it would go that far.'" *Tantimonico*, 637 A.2d at 1057 (quoting 4 Harper, James & Gray, *The Law of Torts* § 27.3 at 139 (2d ed.1986)).

■ Upon leaving the paved portion of the path, the decedent in the instant case had to walk an additional five feet or so to reach the edge of the cliff. It is from this edge of the cliff where the decedent fell. That area was clearly a natural condition of the land, and liability for it could not be imposed upon defendants, even pursuant to § 337 of the Restatement (Second) *Torts*.

■ Even if the area was considered an artificial condition of the land, plaintiffs' argument must fail because the conditions of § 337 cannot be met. Specifically, a visitor to the Cliff Walk certainly should be aware of and appreciate the risks that exist along the edge of a cliff that rises

approximately sixty to seventy feet from the ocean. The top of the portion of the Cliff Walk from which the decedent fell is approximately fifty-three feet from the rock on which he was fatally struck. The rock itself is five feet from the water's edge. The plaintiffs argue in the instant case that the decedent, as well as other visitors, would not be aware of the risk because the Cliff Walk is open during parts of the year when it would be dark, and, specifically, because it was dark when the decedent visited the cliff. This fact, however, should increase one's awareness of the risks associated with the cliff. Indeed, any visitor along the walk in the dark should be that much more cautious, given the height of the cliff and the inability to see adequately where one is stepping.

Accordingly, no liability arises because of the defective condition of the land.

## IV

### G.L.1956 chapter 6 of title 32

The fourth question posed by the Court concerns the effect of chapter 6 of title 32, particularly § 32–6–3 and § 32–6–5, on the duty owed to the decedent. Chapter 6 of title 32 sets forth liability limitations for the public use of private lands. Section 32–6–3, entitled "Liability of Landowner," provides that:

> "Except as specifically recognized by or provided in § 32–6–5, an owner of land who either directly or indirectly invites or permits without charge any person to use that property for recreational purposes does not thereby:
>
> "(1) Extend any assurance that the premises are safe for any purpose;
>
> "(2) Confer upon that person the legal status of an invitee or licensee to whom a duty of care is owed; nor
>
> "(3) Assume responsibility for or incur liability for any injury to any person or property caused by an act of [*sic*] omission of that person."

Section 32–6–5 provides in pertinent part "(a) Nothing in this chapter limits in any way any liability which, but for this chapter, otherwise exists: (1) For the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity after discovering the user's peril * * *."

The plaintiffs and the state have taken the position that the above provisions do not apply in the instant case because the statute is designed to encourage *private property owners* to allow the public to use their land for recreational purposes. The plaintiffs argue that even though § 32–6–2 has been amended to include the state and municipalities as "owners," the statute in force at the time of the accident did not include such entities. The city argues that the statute was applicable to the state and municipalities before the 1996 amendment pursuant to this Court's holding in *O'Brien v. State,* 555 A.2d 334, 338–39 (R.I.1989) (state and/or municipality responsible as a private landowner in certain circumstances).

Regardless of whether the statute is applicable, the duty owed to decedent under the statute would not change in this case. Even under the statute, a landowner owes no duty to a trespasser unless the trespasser is first discovered in a position of peril. *See* § 32–6–5. Section 32–6–5 provides that liability still exists "(1) [f]or the willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity *after discovering the user's peril* * * *." (Emphasis added.) Therefore, as has been stated, no duty would arise toward the decedent until he had been discovered in a position of peril. It is undisputed that he had not been discovered. This rule is simply a legislative codification of the common law that is enunciated in our cases.

## V

### Was summary judgment appropriate?

The final question posed by the Court is whether summary judgment was appropri-

ate in the instant case, or whether the issue of willful and wanton conduct should have been determined by the trier of fact.

■ Summary judgment is appropriate if upon "examination of all the pleadings, affidavits, admissions, answers to interrogatories, and other materials viewed in the light most favorable to the party opposing the motion reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Sullivan v. Town of Coventry,* 707 A.2d 257, 259 (R.I.1998). In the instant case, it is clear that a landowner owes a trespasser no duty except to refrain from willful and wanton conduct *after the trespasser has been discovered in a position of peril.* Absolutely no evidence has been presented to suggest that the defendants or any of them were aware of the decedent's position of peril. Accordingly, summary judgment was properly entered.

## CONCLUSION

For the foregoing reasons, we conclude that the decedent was an undiscovered trespasser to whom the defendants owed no duty. Accordingly, we deny and dismiss the plaintiffs' appeal and affirm the judgment of the Superior Court, to which the papers in the case may be remanded.

FLANDERS, Justice, concurring.

I join in the Court's opinion, but write separately to make the following points and observations:

(1) Although the defendants all knew that the Cliff Walk area in front of Salve Regina University posed certain dangers to users because of soil-erosion problems and the lack of fencing around the cliffs and that these dangers had figured in two deaths and other near-fatal incidents in the past, no evidence suggested that any of the defendants possessed any actual knowledge of the specific condition on the premises—a small gap or hole in the ground between a certain retaining wall in this

area and the adjacent land mass—that allegedly caused Michael Cain (Cain), the plaintiff's decedent, to plummet to his death.

(2) Given the masking effect of certain vegetation in this area, the existence of this particular defective condition was not shown to be, and, in all likelihood, would not have been obvious to any of the defendants. Indeed, we have no indication that the defective condition in question had even existed for any particular period before Cain's tragic death, much less that any defendant knew or should have known of its existence.

(3) Although the hole or gap in question was near the artificial retaining wall, the record contains no evidence to suggest that the hole or condition that caused Cain's death was itself the product of an artificial event instead of a naturally occurring condition, such as erosion, caused by this particular land area's proximity to the cliff.

(4) No evidence exists to show that any defendant knew the deceased was present on the property before this accident occurred, much less that he was in any position of peril before the fall that led to his death. Mere knowledge from past experience that trespassers may be present on the property at any given time after closing hours does not, of itself, impose a duty of care on the property owner running in favor of trespassers, even when the property owner is aware or should be aware of certain obvious hazards that such trespassers may encounter if they are present on the property at night and then put themselves in certain dangerous places there. *Accord Wolf v. National Railroad Passenger Corp.*, 697 A.2d 1082 (R.I.1997).

(5) Finally, Cain's asserted ignorance that the Cliff Walk area was closed under a city ordinance when he was present there in the early hours of the morning before his accidental fall is of no legal consequence. A trespasser's subjective ignorance of the park-hours-closing law, of the park's actual closed status, and/or of the signs that were posted at certain entrances indicating that the park was closed when the trespasser entered the premises and then suffered personal injuries there do not serve to convert the trespasser into a licensee or invitee. *See Bennett v. Napolitano*, 746 A.2d 138, 141–42 (R.I.2000) (enforcing park closing ordinance against trespasser who was injured thereon after hours); see also *Brindamour v. City of Warwick*, 697 A.2d 1075, 1076 (R.I.1997) (treating motorist who entered a public park after closing hours as a trespasser).

On the other hand, if any evidence had existed in this case to show that defendants or any one or more of them knew about this particular hidden peril and further knew that trespassers constantly intruded upon this particular limited area of the land and that they probably would suffer potentially life-threatening injuries upon encountering it unless warned or prevented from doing so, I do not believe I would be voting to affirm the dismissal of these claims on summary judgment. Section 335 of the Restatement (Second) *Torts* (1986) speaks to this issue:

"**Artificial Conditions Highly Dangerous to Constant Trespassers on Limited Area**

"A possessor of land who knows, or from facts within his [or her] knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if

(a) the condition

 (i) is one which the possessor has created or maintains and

 (ii) is, to his [or her] knowledge, likely to cause death or serious bodily harm to such trespassers and

 (iii) is of such a nature that he [or she] has reason to believe that such trespassers will not discover it, and

(b) the possessor has failed to exercise reasonable care to warn such tres-

passers of the condition and the risk involved." [2]

This standard suggests that only a land possessor's actual preexisting knowledge of the highly dangerous condition on the land and its specific locale—in this case, the hole or opening in the ground where Cain fell—would create liability. Here, no evidence indicated that any defendant created or maintained the hole in the ground into which Cain fell. Indeed, we have no reason to believe any defendant knew of this particular defective land condition. Subpart (iii) of §. 335 of the Restatement also seems to require preexisting knowledge of the specific land condition in question because the land possessor must have a preexisting reason to believe that the dangerous condition is "of such a nature that * * * trespassers will not discover it." Here, no evidence suggests any defendant knew about this specific danger at the particular spot where Cain fell to his death. The language of § 335, referring to "a limited area of the land" also supports this reasoning. Thus, a land possessor's mere generalized knowledge of a potential danger presented by an obvious feature of the land—for example, the naturally occurring and obvious danger of a cliff or, for that matter, of an ocean— unaccompanied by the knowledge of some particular additional condition where a hidden danger lurks, would not be enough to give rise to liability, even if the Court were to adopt and follow the above Restatement position. Indeed, other jurisdictions have so held. See, e.g., Helms v. Chicago Park District, 258 Ill.App.3d 675, 196 Ill.Dec. 851, 630 N.E.2d 1016, 1020 (1994) (holding that "a condition may be so blatantly obvious that a defendant cannot reasonably be expected to anticipate that people will fail to protect themselves from any danger posed by the condition" and "[a]n owner or possessor of land has no duty to remedy conditions presenting risks so obvious that

even a child would generally be expected to appreciate and avoid them").

Although the facts in this case, even under the above analysis, present a close call, I do not believe they are sufficient to overcome the high threshold we have established for trespassers to trigger the existence of a legal duty owed to them by the property owner or possessor. Hence, for these reasons and for those set forth in the Chief Justice's opinion for the Court, I concur in the decision to affirm the Superior Court's entry of summary judgment in favor of the defendants.

GOLDBERG, Justice, concurring in part and dissenting in part.

I respectfully dissent from the decision of the majority because I do not believe that under the facts of this case, the decedent's status on the Cliff Walk that fateful night should be classified as that of a trespasser; nor am I satisfied that the defendants, City of Newport and State of Rhode Island, should benefit from an application of the common law trespasser's rule, thereby immunizing these defendants from liability where, in my opinion, the facts demonstrate that Michael Cain (Cain) was an implied licensee. However, for the reasons that follow, I believe that summary judgment on behalf of Salve Regina University (Salve) was correct and appropriate, and that Salve had no duty to repair and maintain the Cliff Walk.

The events that led to this tragic death are particularly sad and egregious. Unfortunately, young Cain, a nineteen-year-old college student, was not the first young man to plunge to his death from the Cliff Walk. In 1987, Brian Putney, a student at Salve, also died as a result of a fall from the Cliff Walk during the nighttime. A member of Putney's family submitted an affidavit to the hearing justice in this case attesting to promises and representations

---

2. Comment b to § 335 of the Restatement (Second) Torts (1986) notes that the principle of this section "appear[s] to be equally applicable to natural conditions of the land * * *."

Here, the record contains no evidence to suggest that the hole or opening into which Cain fell was an artificial condition instead of a naturally occurring phenomenon.

made to the Putney family that a fence would be erected in the area where Putney fell in order to avoid future casualties of this nature. Nothing was done. Further, the record before this Court is replete with evidence that every defendant in this case, for more than a decade before Cain's tragic death, had actual knowledge of the extremely dangerous conditions on the Cliff Walk, yet did nothing to remedy this dire situation. Indeed, the record disclosed that Sister Lucille McKillop (Sister McKillop), then the President of Salve, implored the Newport city manager both before and after Putney's fatal plunge to take corrective action respecting the extremely dangerous area of the Cliff Walk adjacent to the college. Beginning as early as 1979, Sister McKillop began a letter-writing campaign to the city through which she expressed her fear that the entire undersupport of the Cliff Walk in the area adjacent to Salve was so weakened by erosion that the potential for loss of life was great and that safety measures should take priority over the city's desire to make this attraction available to tourists. In May 1983, the city manager informed Salve that he had directed the director of public works to explore the cost of erecting a chain link fence from Webster Street to Shepard Avenue, the very area of Cain's unfortunate demise. Nothing was done. On October 7, 1987, Sister McKillop again wrote to the city manager of Newport and again urged the city "in the strongest way possible" to act to rectify this problem, concluding that "the restoration of the Cliff Walk is a problem which will require the cooperation of City, State, Federal and local property owners. However, the proper definition of the edge of the Cliff Walk with chain link fencing can no longer be put off." Tragically, put off it was. Despite having received written notice of these dangerous conditions and despite the death of Brian Putney, no measures were undertaken to prevent more tragedies.

Further, in July 1989, the North Atlantic Regional Office of the National Park Service produced a report (Park Service Study) that was the culmination of an extensive study of the Cliff Walk commissioned at the request of Congress, designed to evaluate the suitability for including the Cliff Walk in the National Park System. This comprehensive evaluation included formal research into the origins and historical development of the Cliff Walk, a geological appraisal of its significance as a National Natural Landmark, a broad survey of Cliff Walk visitors and various management and maintenance scenarios. Threaded throughout this 1988 study is the recognition that the Cliff Walk is a public easement over private property that has been jealously guarded by the City of Newport as the cornerstone of its tourism industry; and that all parties recognized that the Cliff Walk was in desperate need of improvement from a public-safety standpoint. Significantly, the study noted that "[a] fatality on the cliffs in 1987 and a near fatality in 1988 underline the urgency of stabilizing the treadway. The most recent accident involved a twelve year old girl who survived a forty-foot fall from the Cliff Walk. The fall occurred in an area where vegetation masks severe undermining of the cliff." Moreover, the Park Service Study suggested that evaluations of the Cliff Walk's stability made in 1988, three years before Cain's death, by the United States Army Corps of Engineers and the USDA Soil Conservation Service indicated a serious level of hazard to Cliff Walk visitors.

In addition to this written material, the record before the hearing justice also disclosed that after Cain's body was recovered, a captain of the Newport Fire Department publicly confirmed that the area from which Cain fell was a bad spot, and that to his knowledge, Cain was the third victim. Accordingly, I am satisfied that these defendants had actual notice of the potential for loss of life posed by this particular area of the Cliff Walk and did nothing to forestall this calamity.

Moreover, color photographs in the record depict the area where Cain left the macadam path and fell to his death as a well-worn spot, similar to a man-made overlook, that appears to be a perfectly natural area for a stroller to stop, leave the path, and look out over the Atlantic Ocean. Significantly, this area is defined by an *artificial wall* at the cliff edge, described in the police report as a "wall next to the walkway where the victim was standing [that] was approximately eight (8) inches tall." Cain fell through a hole that opened up on the *landward side* of this man-made concrete barrier, in fulfillment of Sister McKillop's chilling prediction that the entire under-support near this man-made structure was in danger of collapse. The existence of this man-made structure defining the cliff edge, in my opinion, belies the argument of the defendants that the decedent fell as a result of a natural condition on the land. Moreover, this fact standing alone presents a question of fact respecting the conduct of these defendants and whether the placement of this concrete barrier in an area where the landowner knows full well that the entire understructure of the cliff is in danger of collapse amounts to reckless indifference to the safety of the decedent, particularly when the defendants knew full well that the decedent probably would come upon this hazard.

Perhaps the saddest part of this tragedy that resulted in the death of this young man is that following Cain's death, then-Governor Bruce Sundlun ordered immediate action and initiated the installation of a fence for the area. We have been informed that the cost of this repair was $11,960. The meager cost of this preventive measure is a shocking circumstance that in my opinion justifies a trial in this case on the issue of reckless indifference to the safety of Michael Cain.

Finally, I believe that concerning Newport and the state, Cain was not a trespasser but rather a licensee whose presence on the Cliff Walk was anticipated by the city and the state, and that these defendants should not be relieved from liability by the judicially created technicality known as the trespasser's rule. It is well settled that the existence of a duty of care in a negligence case is always a question of law for the court's determination. *Mallette v. Children's Friend and Service*, 661 A.2d 67, 70 (R.I.1995) (citing *Ferreira v. Strack*, 636 A.2d 682 (R.I.1994)). "In determining whether such a duty exists, the court considers 'all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations and notions of fairness.'" *Id.* at 70 (quoting *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 206 (R.I.1994)). The plight of the trespasser is one area of the law in which no duty exists, and as a result, a landowner is immunized from liability.

This Court's jurisprudence surrounding a landowner's duty to an entrant upon land has taken its share of hairpin turns over the last quarter-century. In 1975, we attempted, on public policy grounds, to establish "a new judicial frontier with the expectation that our actions will better today's society," *Mariorenzi v. Joseph DiPonte, Inc.*, 114 R.I. 294, 306, 333 A.2d 127, 133 (1975), by abrogating the common law classifications of an entrant upon the land of another as that of an invitee, licensee or trespasser, distinctions that had been in effect at least since the mid–19th century. Noting that "there has been a change since the days of Lincoln," *id.* at 301, 333 A.2d at 130, that warranted the assignment of this "trichotomy [of invitee, licensee and trespasser] to the historical past" and to "substitute in its place the basic tort test of reasonableness" and foreseeability, we accorded these categories a "final but fitting interment." *Id.* at 307, 333 A.2d at 133. However, nineteen years later we partially exhumed this body of law as it relates to trespassers in recognition that an increasing number of courts had rejected the reasoning that underlay

*Mariorenzi.* We thereupon reinstated the traditional common-law immunity for injuries suffered by trespassers who are engaged in an activity on the property of another without the owner's express or implied consent. *Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056 (R.I.1994). Since *Tantimonico,* we have steadfastly adhered to this rule and have upheld the dismissal of claims alleging landowner liability by persons who trespassed upon the land of the defendant. *Bennett v. Napolitano,* 746 A.2d 138 (R.I. 2000); *Wolf v. National Railroad Passenger Corp.,* 697 A.2d 1082 (R.I.1997); *Brindamour v. City of Warwick,* 697 A.2d 1075 (R.I.1997).

The implementation of the trespasser's rule has without question lead to harsh results, yet its unsparing application has never been in doubt, nor has there been any real effort to revert yet again to a traditional application of negligence law. However, I believe that we are traveling on a two-way street. The availability of judicially created immunity for the owner of land who asserts that no duty was owed to the decedent because of his or her status as a trespasser should be carefully scrutinized for factual accuracy and reliability. I am of the opinion that for a defendant to take advantage of this judge-made rule and thus escape liability, the status of the injured party should be clear and unequivocal. I do not believe that one can hold out an implicit invitation to visit a tourist attraction for the economic benefit of the city/state landowner on the one hand, then seek to escape liability to those who have accepted the invitation and are injured or killed—due to the landowner's negligence—by arguing that the mishap occurred at a time when the park was closed pursuant to an ordinance that is neither enforced nor brought to the public's attention. The fact that Cain was completely ignorant that the Cliff Walk purportedly was closed, in my opinion, is fatal to the city's defense. Accordingly, I am of the opinion that from the standpoint of the City of Newport and the State of

Rhode Island, Cain was not a trespasser, but was an implied licensee, and that the grant of summary judgment in favor of the governmental defendants was error. With respect to Salve, I am of the belief that Salve has no ownership interest in the Cliff Walk sufficient to impose a duty of care to guard against injuries that may befall Newport's summer tourists.

When this Court resurrected the trespasser's rule in *Tantimonico,* the distinction between a licensee and an invitee remained interred. Under our law, the duty of care owed to a licensee and an invitee is identical and requires the owner to exercise reasonable care to secure the premises against injury that is foreseeable and preventable by undertaking reasonable precautions. Under this rule, "the basic tort test of reasonableness" defines the duty owed by a landowner toward an entrant onto his or her lands, and "the question to be resolved will be whether the owner has used reasonable care for the safety of all persons reasonably expected to be upon his premises." *Mariorenzi,* 114 R.I. at 307, 333 A.2d at 133. Thus, under this analysis, I am satisfied that the evidence in this case demonstrates that Cain was reasonably expected to be upon the Cliff Walk that summer evening, that he was not given notice that the Cliff Walk was closed, and that genuine questions of fact remain relative to whether the governmental defendants were in breach of the aforementioned duty of care.

The majority opinion assumes, without deciding, that the decedent's relationship to all three defendants was identical and that his status as a trespasser was the same with respect to all defendants. I disagree with the premise that all three defendants should be squeezed under the same umbrella of trespasser immunity. In my opinion, the relationship of the decedent to each defendant, like the Cliff Walk itself, is unique.

### City of Newport

I am of the opinion that Cain, as a tourist visitor to Newport's famed Cliff

Walk on that fateful August night, was not a trespasser, but was an implied licensee whose presence on the Cliff Walk was not only anticipated, it was welcomed. Further, I believe that Newport has benefited significantly from the continued vitality of the Cliff Walk as the brightest gem in its tourism crown, and accordingly has always held out an implicit invitation to its summer tourists to come to Newport and visit this attraction. The record discloses that Cain and his friends entered the Cliff Walk from Forty Steps, a public entrance to the walk at the end of Narragansett Avenue, an area where the city deliberately decided to forgo the placement of signs notifying the public that the park was closed. Notably, the Park Service Study described the Forty Steps as a long-standing "popular gathering place along the Cliff Walk [that] may in fact predate the development of the walk itself," and indicated that the restoration of its beloved Forty Steps following the great 1938 hurricane was the first occasion in which the City of Newport expended public funds on a site related to the Cliff Walk. The fact that there was not a single sign indicating the hours the Cliff Walk was closed to the public at this crucial location defeats any suggestion that Cain was anything but a licensee when he and his friends parked a vehicle on the public street, walked down the very public Forty Steps, and entered the Cliff Walk on a moonlit August night. Accordingly, in my opinion, the City of Newport may be liable in damages for Cain's tragic death, and the judicially created immunity for trespassers ought not be available under the facts of this case. I am satisfied that concerning the City of Newport, Cain was a licensee and that summary judgment on the basis of the trespasser's rule was inappropriate.

Since its inception, the area surrounding the cliffs along the western side of Easton's Bay out to the Atlantic Ocean always has been open for public use and enjoyment. According to the Park Service Study, as early as 1867, "Newporters began to recognize that they possessed an invaluable asset in the path along the cliffs" that figured prominently in the growing image of Newport as the ultimate vacation spot for the inhabitants of the Gilded Age. As private property along Bellevue Avenue and the ocean became available for development by the robber barons of high society, the Cliff Walk endured and was improved on most parcels to the point that it was connected with drives and walkways through many of the estates. Although no serious effort to block public passage over the Cliff Walk ever has been launched, when it came time for the expenditure of public funds for restoration and rehabilitation projects, questions arose about the legal status of the public's right to pass along the Cliff Walk through privately owned lands.

On every occasion, the city loudly proclaimed that the Cliff Walk was a public easement over which the city was the supreme authority. In 1968, with a project by the Army Corps of Engineers in the balance, the city enacted an ordinance that placed the Cliff Walk under formal city authority and established the Cliff Walk Commission. Thus, a pattern developed in which whenever public funding was available for Cliff Walk repair and restoration projects, the city repeatedly declared to any one who would listen that the Cliff Walk was a public resource under the aegis of the City of Newport that was to be forever open for the use and enjoyment of the sea by anyone who cared to partake of its grandeur. The Cliff Walk Commission was established to manage and expend funds that may be,

> "contributed to or by the City for the repair, renovation, improvement and maintenance of that certain walk known as 'Cliff Walk' * * * which walk was originally created by the owners of land abutting on the cliffs and which walk *shall be open to the general public for the purpose of passing and repassing on foot along the face of the cliffs.*" (Emphasis added.)

When the Army Corps of Engineers sought an opinion from the city confirming the public's right to pass and repass along the right-of-way before it undertook the expensive rehabilitation project, the city solicitor, in a detailed response, opined that the owners of the various estates abutting the cliffs, from about 1840 through 1890, laid out the walk and made an incipient dedication of the Cliff Walk to the public, "and by the continued use by the general public there has arisen a public easement to pass and repass, for pedestrian purposes, a foot path around the edge of the Cliffs." Not satisfied with this opinion, the Army Corps of Engineers insisted that the City Council act to formally ratify the opinion by council resolution that would assure the Army Corps of Engineers, "that the City will maintain the public easement of passage along the Cliff Walk." The resolution did the trick, and the money was forthcoming. Work commenced in 1971, resulting in substantial repairs along almost half of the Cliff Walk.

Since that time, Newport continually has exercised its right of sovereignty over the Cliff Walk and has benefited from restoration projects totaling more than $2.5 million in federal, state and municipal money, including a cooperative project in the early 1980's that restored a deteriorated section adjacent to Salve. Time and again, when confronted with a situation to its economic advantage in which financial aid to maintain and repair the Cliff Walk was in the offing, the city, through its lawyers, repeatedly assured the state and various federal agencies of the public nature of the Cliff Walk and its solemn intention to protect the right of the public to pass and repass over the walk.[3] Accordingly, I am satisfied that the Cliff Walk remains a public easement over which the city and the state have ultimate responsibility and control.

However, notwithstanding these oft-repeated exhortations that the Cliff Walk is a right-of-way over which the city has ultimate authority, before this Court the city sought to avoid responsibility by arguing that its primary defense "is a lack of ownership of the Cliff Walk and thus lack of a duty to repair and maintain the same." Besides the defense of lack of ownership, the city sought summary judgment on the ground that Cain was a trespasser. This defense rested solely on an obscure ordinance that Newport's solicitor declared he had no intention of enforcing that provided that the Cliff Walk, "shall be closed for public use between nine p.m. and six a.m. of the following day, daily * * * except that the Cliff Walk shall remain open for the purpose of access to the water for fishing." Significantly, when asked for his opinion concerning the propriety of establishing closing hours for the Cliff Walk and whether there was a need for signs, the city solicitor reminded the city manager and the chief of police that the Cliff Walk was considered a right-of-way, with the abutting property owners holding the fee subject to the public right-of-way. Thereafter, the solicitor responded that the lack of appropriate signs outlining the restrictions to the public is problematic and that putting up signs would be helpful:

> "in terms of enforceability; however, I do not think [signs] are legally necessary to enforce the ordinance. Regardless, from an enforcement perspective in cutting down on the number of potential violators, signage would certainly help. I intend to take the position in prosecuting these offenses that ignorance of the law, at least initially, is an excuse."

I am satisfied that this ordinance and the Cliff Walk's purported closing hours, in the absence of signs and an intent to enforce the closing hours, is insufficient, as a matter of law, to terminate the implied license

---

**3.** Included in these opinion letters is a reference to article 1, section 17, of the Rhode Island Constitution of 1843 that guarantees the right of the people to access to the shore for purposes of fishing and the gathering of seaweed. This reference appears to suggest that the public's right of access is of state constitutional dimensions.

extended to the public to use the Cliff Walk for its intended purpose.

Moreover, contrary to the city's assertion that it has no relevance to this case, the exception in the ordinance providing that the Cliff Walk shall remain open for fishing is the decisive factor in my conclusion that Cain was a licensee whose presence on the Cliff Walk was anticipated. The ordinance specifically provides that the Cliff Walk is *never closed* "for the purpose of access to the water for fishing." This exception defeats the defense of trespass because the city has impliedly licensed a class of persons to use the Cliff Walk *at any time* for a particular purpose, and therefore, it does not matter whether the decedent is a member of that particular class of persons who happen to be carrying fishing poles. Section 330 of the Restatement (Second) *Torts* (1965) defines a licensee as "a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Significantly, comment *f* to § 330 specifically addresses the instant situation and provides as follows:

> "If the possessor has, by word or conduct, sufficiently expressed his consent to the entry of *all others* or a *particular class*, it is immaterial whether the particular person entering knows or does not know of the acts or words by which this consent is expressed. *So too, where it is local custom for possessors of land to permit others to enter their land for particular purposes, it is immaterial that the particular person entering is not a member of the local community, or, if a member of the local community, is ignorant of the custom.*" (Emphases added.)

I am satisfied that in this case, Newport cannot have it both ways; as *comment f* to § 330 of the Restatement (Second) *Torts* provides, where the owner extends an invitation to a particular class of persons to use his or her property and an entrant is upon the land with or without knowledge of the invitation or its purpose, that person

is a licensee. Accordingly, I am satisfied that with respect to the City of Newport, Cain was a licensee to whom the duty to use reasonable care to prevent his death was owed.

### State of Rhode Island

With respect to the state, I believe that there is a genuine issue of material fact with respect to the state's relationship to the Cliff Walk. The record is replete with evidence of joint city-state efforts to secure funding for Cliff Walk restoration and evidence that during the past two decades the state has spent hundreds of thousands of dollars on improvements to this historical landmark. Obviously, because it is my opinion that the Newport ordinance is insufficient as a matter of law to render Cain a trespasser, likewise the state may not rely upon it as a defense to liability. Thus, as to the defendant State of Rhode Island, I believe that a trial on the merits is warranted, in which the state's relationship to the Cliff Walk is more fully developed. The record reflects that the state undertook significant preventive measures immediately after this tragedy, including the placement of the chain link fence that clearly would have prevented this tragedy.

Therefore, I would remand for trial on the issue of whether Newport is the only culpable defendant, or whether the state, in light of its conduct with respect to the Cliff Walk, is also an owner that bears some responsibility for its maintenance and repair.

### Salve Regina University

The relationship of Salve to the Cliff Walk and the decedent requires an entirely different analysis. I am satisfied that Salve owed no duty to Cain, not because of his purported status as a trespasser, but because Salve simply has no duty to repair and maintain the Cliff Walk. The record in this case demonstrates that Salve's relationship to the Cliff Walk is identical to that of all abutters who own fee title to the walk subject to the public's right to pass

and repass. Because the abutters have no right to regulate the goings-on along the Cliff Walk, nor may they lawfully exclude the public, these abutters, in my opinion, have no duty to repair and maintain the Cliff Walk for the thousands of tourists who visit this attraction each year. This determination of no duty is fair and does justice to these long-suffering abutters who watch approximately 150,000 visitors stroll along their property on a yearly basis.

Moreover, I am satisfied that, unlike the city and state, Salve has never extended an invitation, express or implied, to the public to visit this tourist attraction. Thus, I do not believe that Salve was under a duty to repair or maintain the Cliff Walk to make it safe for the public for recreational purposes. Further, the record demonstrates that Salve never has declared any ownership interest in the Cliff Walk and never has assumed any responsibility for its maintenance or repairs, except for minor landscaping for aesthetic purposes.

Finally, the record is clear that Cain entered the Cliff Walk from a public street and never actually entered Salve's campus. Accordingly, as to the defendant Salve, I would find that because of the Cliff Walk's public nature, Salve has no duty to maintain or repair the Cliff Walk, and that the duty of care belongs to the governmental defendants in this case. Although for reasons other than those relied upon by the trial justice, I would affirm the grant of summary judgment in Salve's favor. *See R & R Associates v. City of Providence Water Supply Board*, 724 A.2d 432, 436 (R.I.1999).

### Statutory Immunity

In the event this Court determined that any of the defendants directly or indirectly invited or permitted Cain to use the subject property for recreational purposes, we directed the parties to address whether the duty toward Cain would differ in any respect from that owed to a trespasser pursuant to G.L.1956 chapter 6 of title 32.

My answer to that question is decidedly no, because the statute in effect at the time of this tragedy specifically applied to private landowners, not governmental entities. It was not until 1996 that the General Assembly amended the definition of "owner" to expressly include the state and municipalities (P.L.1996, ch. 234, § 1). Under well accepted rules of statutory construction, the amendment is not given retroactive effect in the absence of a provision clearly according retrospective application to the amendment. *Avanzo v. Rhode Island Department of Human Services*, 625 A.2d 208, 211 (R.I.1993) (citing *Lawrence v. Anheuser-Busch, Inc.*, 523 A.2d 864, 869 (R.I.1987)).

In *Tantimonico*, this Court referenced this recreational use statute and stated that the:

"obvious intention of the Legislature was to treat those who use private property for recreational purposes as though they were trespassers. This indicates that to accomplish the objective of opening up land to meet the growing public demand for recreational space, the Legislature resurrected the landowner's common-law immunity as to trespassers prior to *Mariorenzi*. The Legislature appears to have made a judgment that the social benefits of resurrecting the common-law classification at least for this purpose outweighed the costs to recreational users." *Tantimonico*, 637 A.2d at 1060-61.

Besides the fact that neither the state nor its municipalities was included in the recreational use statutes, I believe that this chapter has no application to Newport's Cliff Walk because the Cliff Walk is a public place with all of the attributes of a public park. As such, the Cliff Walk does not meet the purpose of the recreational use statute, which is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability to persons entering thereon for those purposes." Section 32-6-1. Accordingly, I believe

that this chapter has no application to the state's public parks, beaches and recreation areas that are specifically intended to be open to the public for recreational purposes. Therefore, I would answer question 5 in the negative.

### Conclusion

For the reasons stated herein, I would sustain the plaintiffs' appeal of the entry of summary judgment in favor of the State of Rhode Island and the City of Newport, vacate the judgments in favor of Newport and the State of Rhode Island, and remand this case for a trial on the merits. I would, however, deny plaintiffs' appeal from the summary judgment in favor of Salve Regina University, but for reasons other than those relied upon by the trial justice.